Case No. 22-5469

IN THE

# United States Court of Appeals

FOR THE

SIXTH CIRCUIT

NISSAN NORTH AMERICA INC.,
Plaintiff-Appellant,

v.

CONTINENTAL AUTOMOTIVE SYSTEMS INC.,
Defendant-Appellee,
and
CONTITECH NORTH AMERICA INC. and
CONTINENTAL TIRE THE AMERICAS LLC,
Defendants.

On appeal from the United States District Court for the
Middle District of Tennessee
No. 3:19-cv-0396

**BRIEF OF APPELLANT,
NISSAN NORTH AMERICA INC.**

Eugene N. Bulso Jr.
Paul J. Krog
Bulso PLC
155 Franklin Road, Suite 400
Brentwood, Tennessee 37027
615-913-5200
615-913-5150
gbulso@bulso.com
pkrog@bulso.com

Oral Argument Requested

# DISCLOSURE OF CORPORATE AFFILIATIONS
# AND FINANCIAL INTEREST

Sixth Circuit        Case Name:   Nissan North America Inc. v.
Case Number: 22-5469            Continental Automotive Systems Inc.

Name of counsel: Paul J. Krog

Pursuant to 6th Cir. R. 26.1, Nissan North America Inc. makes the following disclosure:

1. Is any said party a subsidiary or affiliate of a publicly owned corporation? Yes: Nissan North America Inc. is a wholly owned subsidiary of Nissan Motor Co. Ltd., a Japanese corporation publicly traded in Japanese security markets with American Depository Receipts traded in U.S. markets.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? Yes: Nissan Motor Co. Ltd., as the owner of 100% of Nissan North America Inc.'s outstanding capital stock.

## CERTIFICATE OF SERVICE

I certify that on September 9, 2022, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

                s/ Paul J. Krog
                Counsel for Appellant

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST ........................................................................................... i

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES ................................................................. vi

STATEMENT CONCERNING ORAL ARGUMENT .............................. 1

JURISDICTIONAL STATEMENT ....................................................... 2

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................... 3

INTRODUCTION & STATEMENT OF THE CASE ............................. 5

   A.   Introduction ................................................................................. 5

   B.   Factual Background ..................................................................... 8

      1.   The X61A program and its brakes. .......................................... 8

      2.   Nissan buys Continental parts via purchase orders. ............ 11

      3.   The Delta Stroke Sensor .......................................................... 14

      4.   The DSS experiences high repair rates: Continental develops a software fix, but customer litigation ensues. ....... 16

      5.   A 2012 crash in California leads to personal-injury claims against Nissan and Continental for alleged defects in Continental-supplied brake components ................................ 18

      6.   The *Cruz* Plaintiffs allege a design defect in the ECU and DSS and obtain a $24 million verdict against Nissan. ......... 19

      7.   The California courts uphold the plaintiffs' verdict, and Nissan satisfies the judgment. .............................................. 22

   C.   Procedural Background ................................................................ 24

SUMMARY OF ARGUMENT .............................................................. 27

ARGUMENT ....................................................................................... 30

1.   Governing law and standard of review............................................30

   1.1. This Court reviews summary judgment rulings de novo,
       considering each motion independently. ................................30

   1.2. Tennessee law controls the parties' contract and California
       law controls the *Cruz* judgment. ............................................31

   1.3. This Court reviews the District Court's *sua sponte* decision
       to grant summary judgment on litigation expenses for an
       abuse of discretion and the disposition itself de novo...........31

2.   The Terms and Conditions obligate Continental to reimburse
   Nissan for damages and costs caused by claims that
   Continental's parts were injuriously defective..............................32

   2.1. Under Tennessee law, the contract's plain terms govern. .....33

   2.2. The plain meaning of Paragraph 8 ties Continental's
       obligation to the theory of a claim. .......................................34

   2.3. The parties' relationship and other portions of the Terms
       and Conditions reinforce the plain meaning of Paragraph 8.40

   2.4. The District Court relied on inapposite cases interpreting
       language in form insurance contracts, divorced from the
       language in Paragraph 8. .......................................................44

   2.5. Nissan incurred damages and cost arising from claims of
       personal injury caused by defective parts supplied by
       Continental, or at least a jury could so find. .........................47

      2.5.1.*The record confirms that Nissan incurred damages and
          costs from the* Cruz *plaintiffs' claim that Continental's
          parts were defective.*.......................................................47

      2.5.2.*Even if the District Court could have denied Nissan's
          summary judgment motion, it erred in granting
          Continental's.* ................................................................49

3.   Even under the District Court's construction of Paragraph 8,
   Nissan is entitled to summary judgment, and Continental is
   not.................................................................................................50

3.1. The *Cruz* plaintiffs consistently and necessarily alleged a defect in Continental's parts.....................................................51

    3.1.1. *Every stage of* Cruz *entailed an attack on Continental's parts.* ...........................................................52

    3.1.2. *The* Cruz *plaintiffs blamed no other parts.* .....................54

3.2. The California courts confirmed that the *Cruz* judgment rested on defects in Continental's software............................55

    3.2.1. *The trial judge confirmed and offset the verdict, holding the plaintiffs had proven a software defect caused the accident.* ........................................................56

    3.2.2. *The Court of Appeal affirmed, holding the software's benefits did not outweigh its risks.* ...................................58

3.3. The California courts' rulings bind Continental.....................59

3.4. The District Court misconstrued the preclusive effect of *Cruz* and erred in granting Continental summary judgment. ......................................................................60

4.   The District Court improperly entered summary judgment *sua sponte* on the *Cruz* defense costs.....................................................63

4.1. The District Court abused its discretion by awarding summary judgment to Continental on Nissan's claims for defense costs on a basis not briefed and without notice. .......64

4.2. The allocation question is one of the amount, not existence, of damages, for which summary judgment was inappropriate...........................................................66

CONCLUSION ..........................................................................67

CERTIFICATE OF COMPLIANCE.........................................................68

6th CIRCUIT RULE 30(G) DESIGNATION OF RELEVANT DOCUMENTS.....................................................................69

FEDERAL RULE OF APPELLATE PROCEDURE 28(f) COMPENDIUM .........................................................................77

APPENDIX A ........................................................................ 80

APPENDIX B ........................................................................ 88

CERTIFICATE OF SERVICE............................................... 139

# TABLE OF AUTHORITIES

## Cases

*Acuity v. Reed Assocs. of TN LLC,*
124 F. Supp. 3d 787 (W.D. Tenn. 2015) ...........................................46

*Am. Guar. & Liabl. Ins. Co. v. Norfolkf S. Ry.,*
278 F. Supp. 3d 1025 (E.D. Tenn. 2017) .........................................65

*Anderson v. Liberty Lobby Inc.,*
477 U.S. 242 (1986)..........................................................................30

*Assurance Co. of Am. v. Continental Dev. & Constr. Inc.,*
No. 3:08-cv-0711 (M.D. Tenn. June 8, 2009)...................................48

*B.F. Goodrich Co. v. U.S. Filter Corp.,*
245 F.3d 587 (6th Cir. 2001)............................................................30

*Barker v. Lull Eng'g Co.,*
573 P.2d 443 (Cal. 1978)..................................................................59

*Barnhart v. Thomas,*
540 U.S. 20 (2003)............................................................................38

*Barrese v. Murray,*
198 Cal. App. 4th 494 (2011) ...........................................................49

*Bennett v. City of Eastpointe,*
410 F.3d 810 (6th Cir. 2005)........................................ 32, 64, 65, 66

*Bob Pearsall Motors Inc. v. Regal Chrysler-Plymouth Inc.,*
521 S.W.2d 578 (Tenn. 1975)...........................................................33

*Border Bus. Park Inc. v. City of San Diego,*
142 Cal. App. 4th 1538 (2006) .........................................................61

*Bostick v. Flex Equip. Co.,*
147 Cal. App. 4th 80 (2007) .............................................................57

*Britton v. Prudential Ins. Co. of Am.,*
205 Tenn. 726 (1959) .......................................................................39

*Brocklesby v. United States*,
   767 F.2d 1288 (9th Cir. 1985)..........................................................62

*Chateau De Louis LLC v. Everest Indem. Ins. Co.*,
   No. A130349, 2013 WL 3441354 (Cal. Ct. App. July 9, 2013).........63

*City of Arcadia v. State Water Res. Control Bd.*,
   191 Cal. App. 4th 156 (2010)...........................................................61

*Clark v. Martinez*,
   543 U.S. 371 (2005)..........................................................................38

*Clark v. Sputniks LLC*,
   368 S.W.3d 431 (Tenn. 2012)...........................................................60

*Combs v. Int'l Ins. Co.*,
   354 F.3d 568 (6th Cir. 2004).............................................................31

*CSX Transp. Inc. v. General Mills Inc.*,
   2015 WL 468682 (N.D. Ga. Feb. 3, 2015).......................................46

*Eilrich v. Remas*,
   839 F.2d 630 (9th Cir. 1988).............................................................61

*Employers Reinsurance Corp. v. Mid-Continent Cas. Co.*,
   358 F.3d 757 (10th Cir. 2004)...........................................................39

*Espinoza v. Machonga*,
   9 Cal. App. 4th 268 (1992)................................................................57

*Executive Risk Indem. Inc. v. Jones*,
   171 Cal. App. 4th 319 (2009)............................................................60

*Fakhouri v. Ober Gatlinburg Inc.*,
   821 F.3d 719 (6th Cir. 2016).............................................................38

*Ferro Corp. v. Cookson Grp. PLC*,
   585 F.3d 946 (6th Cir. 2009).............................................................30

*G.T. Issa Constr. LLC v. Blalock*,
   No. E2020-0853, 2021 WL 5496593 (Tenn. Ct. App. Nov. 23, 2021)
   ...........................................................................................................65

*Graham-Humphreys v. Memphis Brooks Museum of Art Inc.*,
209 F.3d 552 (6th Cir. 2000) ............................................................ 30

*Hamblen Cnty. v. City of Morristown*,
656 S.W.2d 331 (Tenn. 1983) ............................................................ 43

*Hartford Fire Ins. Co. v. California*,
509 U.S. 764 (1993) ............................................................................ 45

*Hernandez v. City of Pomona*,
207 P.3d 506 (Cal. 2009) .................................................................... 60

*In re JTS Corp.*,
617 F.3d 1102 (9th Cir. 2010) ........................................................... 57

*Individual Healthcare Specialists Inc. v. BlueCross BlueShield of Tenn. Inc.*,
566 S.W.3d 671 (Tenn. 2019) ................................................. 33, 40, 43

*Key v. Tyler*,
34 Cal. App. 5th 505 (2019) ............................................................... 61

*Lee v. Butcher Boy*,
169 Cal. App. 3d 375 (1985) .............................................................. 57

*Lewisburg & Nashville R.R. v. Hinds*,
183 S.W. 985 (Tenn. 1916) ................................................................ 38

*Lucido v. Superior Ct.*,
795 P.2d 1223 (Cal. 1990) ................................................................. 61

*Maggart v. Almany Realtors Inc.*,
259 S.W.3d 700 (Tenn. 2008) ...................................................... 33, 37

*Matsushita Elec. Indus. Co. v. Epstein*,
516 U.S. 367 (1996) ....................................................................... 31, 60

*McQueen v. Williams*,
177 F.3d 523 (6th Cir. 1999) ............................................................ 31

*Metro. Life Ins. Co. v. Smith*,
554 S.W.2d 123 (Tenn. 1977) ........................................................... 39

*Milan Supply Chain Sols. Inc. v. Navistar Inc.*,
  627 S.W.3d 125 (Tenn. 2021) ........................................................... 41

*Moorehead v. Tenn. Farmers Mut. Ins. Co.*,
  No. M2020-1319, 2021 WL 2935454 (Tenn. Ct. App. July 13, 2021)
  .......................................................................................................... 33

*N. German Lloyd v. Guar. Trust Co.*,
  244 U.S. 12 (1917) ............................................................................ 43

*N. Ins. Co. of N.Y. v. Target Corp.*,
  717 F. App'x 571 (6th Cir. 2017) ..................................................... 42

*Nishihama v. City & Cnty. of San Francisco*,
  93 Cal. App. 4th 298 (2001) ............................................................ 62

*O'Neil v. Crane Co.*,
  266 P.3d 987 (Cal. 2012) ............................................................ 52, 57

*Park Corp. v. Great Am. Indem. Co.*,
  213 S.W.2d 12 (Tenn. 1948) ............................................................ 45

*Pfahler v. Nat'l Latex Prods. Co.*,
  517 F.3d 816 (6th Cir. 2007) ........................................................... 67

*Planters Gin Co. v. Fed. Compress & Warehouse Co.*,
  78 S.W.3d 885 (Tenn. 2002) ............................................................ 42

*Pullman Standard Inc. v. Abex Corp.*,
  693 S.W.2d 336 (Tenn. 1985) .......................................................... 40

*Pyle v. Bituminous Cas. Corp.*,
  299 S.W.2d 665 (Tenn. Ct. App. 1956) ........................................... 59

*Rafeiro v. Am. Employers' Ins. Co.*,
  5 Cal. App. 3d 799 (1970) ................................................................ 48

*Reeser v. Yellow Freight Sys. Inc.*,
  938 S.W.2d 690 (Tenn. 1997) ..................................................... 46, 65

*Richko v. Wayne Cnty.*,
  819 F.3d 907 (6th Cir. 2016) ........................................................... 50

*Rutherford v. Owens-Ill. Inc.*,
    941 P.2d 1203 (Cal. 1997) ................................................................ 51

*S. Knoxville Brick Co. v. Empire State Sur. Co.*,
    150 S.W. 92 (Tenn. 1912) ................................................................. 45

*Savedoff v. Access Grp. Inc.*,
    524 F.3d 754 (6th Cir. 2008) ........................................................... 31

*Saxena v. Goffney*,
    159 Cal. App. 4th 316 (2008) .......................................................... 61

*Shelton v. Rutherford Cnty.*,
    780 F. Supp. 2d 653 (M.D. Tenn. 2011) ......................................... 49

*Shuler v. Capital Agr. Prop. Servs. Inc.*,
    49 Cal. App. 5th 62 (2020) ............................................................... 31

*SLPR LLC v. San Diego Unified Port Dist.*,
    49 Cal. App. 5th 284 (2020) ............................................................ 63

*Soule v. Gen. Motors Corp.*,
    882 P.2d 298 (Cal. 1994) .................................................................. 51

*St. Paul Fire & Marine Ins. Co. v. Torpoco*,
    879 S.W.2d 831 (Tenn. 1994) .......................................................... 46

*Tolan v. Cotton*,
    572 U.S. 650 (2014) .......................................................................... 63

*Travelers Indem. Co. of Am. v. Moore & Assocs. Inc.*,
    216 S.W.3d 302 (Tenn. 2007) .......................................................... 44

*Trinity Indus. Inc. v. McKinnon Bridge Co.*,
    147 S.W.3d 225 (Tenn. Ct. App. 2003) .......................................... 33

*Vandermark v. Ford Motor Co.*,
    391 P.2d 168 (Cal. 1964) ............................................................ 42, 51

*Vantage Tech. LLC v. Cross*,
    17 S.W.3d 637 (Tenn. Ct. App. 1999) ............................................ 37

*Whitley v. White*,
    140 S.W.2d 157 (Tenn. 1940) .......................................................... 39

*Wimberly v. Derby Cycle Corp.*,
   56 Cal. App. 4th 618 (1997) ............................................................52

**Statutes**

Cal. Civ. Code § 1431.2.....................................................................57

Cal. Civ. Proc. Code § 387.................................................................60

Cal. Civ. Proc. Code § 877...........................................................20, 57

**Other Authorities**

49 C.F.R. § 571.135...........................................................................9

Antonin Scalia & Bryan Garner,
   *Reading Law: The Interpretation of Legal Texts* (2012) .................38

Bryan A. Garner,
   *The Chicago Guide to Grammar, Usage, and Punctuation* (2016)
   .......................................................................................35, 36

*Chicago Manual of Style* (16th ed. 2010) ..........................................35

John E. Warriner,
   *English Composition and Grammar: Third Course* (1988) .............36

Randolph Quirk et al.,
   *A Comprehensive Grammar of the English Language* (2010) ...35, 38

## STATEMENT CONCERNING ORAL ARGUMENT

Nissan requests oral argument. This case presents an interpretive question about a previously unconstrued indemnification clause. It also arises out of a complex underlying dispute involving tens of millions of dollars. Oral argument would materially help the Court assess the case and the parties' positions.

# JURISDICTIONAL STATEMENT

This case was originally filed in Tennessee state court. (Compl., RE 1-1, PID 13.) All Defendants filed a timely notice of removal to the appropriate District Court, *see* 28 U.S.C. § 123(b)(1). (Notice of Removal, RE 1, PID 1.) The District Court had jurisdiction under 28 U.S.C. § 1332, and thus under 1441, because Nissan, then a California corporation with its principal place of business in Tennessee, sought over $30 million in damages and was completely diverse from Defendants, none of whom were citizens of Tennessee or California. (*See* Notice of Removal, RE 1, PID 3; Miller Decl., RE 1-3, PID 139.) Defendants Contitech North America Inc. and Continental Tire the Americas LLC[1] were dismissed on November 25, 2020. (Order, RE 121, PID 6139.)

This Court possesses jurisdiction under 28 U.S.C. § 1291 because the District Court entered a final order on May 26, 2022, dismissing all remaining claims. (Order, RE 224, PID 19852.) Judgment was entered the same day. (Judgment, RE 225, PID 19853.) Nissan timely appealed on May 31, 2022. (Notice of Appeal, RE 226, PID 19854.)

---

[1] The LLC's sole member is an LLC whose sole member is a Dutch *besloten vennootschap*, a corporation for diversity purposes. *BouMatic LLC v. Idento Operations*, 759 F.3d 790, 791 (7th Cir. 2014).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.   Nissan bought brake parts from Continental, which agreed to provide indemnity for "damages or cost arising from claims of personal injury … caused directly or indirectly by defective parts" it supplied. Third parties sued Nissan, claiming injuries caused by defective Continental parts, and obtained a judgment on this claim. Did the District Court err by holding Nissan was not entitled to indemnification for its damages and cost from this claim of personal injury caused by defective Continental parts?

2.   The District Court interpreted the parties' contract as requiring Nissan to show the Continental-supplied parts were actually defective and caused the third parties' injuries. The California record, judicial rulings, and appellate decision confirm the third parties exclusively and successfully claimed defects in Continental-supplied parts. Assuming the District Court properly interpreted the contract:

   a.   Did it err by concluding that issue preclusion did not establish as to Continental that the third parties were injured by defective Continental parts?

b.  Did it err by granting Continental's cross-motion for summary judgment when a reasonable factfinder could conclude from the California record that the judgment rested on a finding of defective Continental parts?

3.   The law prohibits entry of summary judgment *sua sponte* when a respondent lacks notice that an issue is under consideration. The District Court also entered summary judgment on Nissan's claims for its California legal expenses on the premise Nissan had not allocated them among claims, an issue Continental never raised. Did the District Court abuse its discretion or err by dismissing this claim based on uncertainty about the amount, not existence, of damages?

## INTRODUCTION & STATEMENT OF THE CASE

### A. Introduction.

Continental agreed to indemnify Nissan for losses arising from certain "claims." When Continental refused to do so, Nissan brought this suit. The parties cross-moved for summary judgment, and the District Court ruled correctly in multiple respects, including by finding the parties had a contract in the first place. Yet it made one key analytical error when it applied case law about form insurance policies to the non-form contractual language on a purchase order. That led the District Court to conclude Nissan had to prove the facts underlying the "claim," something its contract did not require, but that a standard commercial insurance policy might have. And because the District Court read the contract that way, it looked at the issue-preclusive effect of the judgment resulting from the "claims" for which Nissan had sought indemnification. But the District Court lacked the benefit of briefing on this topic, and it overlooked important nuances in California law (which governed).

The District Court's recourse to inapplicable insurance-industry case law turned a simple case about "claims" into a complicated one about underlying defects and injuries. Scrutinized in light of the governing

terms in the parties' agreement, the record shows the judgment in favor of Continental must be reversed and either judgment entered in favor of Nissan or, at least, the case remanded for trial.

**\* \* \***

Terms and Conditions in a contract between Nissan and Continental required the latter to indemnify Nissan for "damages or cost arising from claims of personal injury … caused directly or indirectly by defective parts supplied by [Continental]." So when a California jury awarded, and California courts upheld, a $24 million verdict against Nissan on a claim that brake components supplied by Continental were defective, Nissan sued Continental for indemnification. Rightly so.

On cross-motions for summary judgment, however, the District Court denied Nissan's motion and granted Continental's, holding the underlying California verdict ambiguous as to whether that jury had indeed found Continental's parts defective. The District Court went on to *sua sponte* deny Nissan's request for its California litigation expenses on a basis Continental hadn't moved on and, therefore, to which Nissan hadn't responded.

The judgment should be reversed, or at least vacated. Under

Tennessee's rules of contract interpretation, the plain meaning of the parties' Terms and Conditions requires indemnification for damages and costs based on proof they arose from a qualifying *claim* of defect, not from a defect itself. There is no dispute such a claim was filed and that Nissan incurred damages and costs as a result. Given that, Nissan was entitled to summary judgment.

But even under the District Court's interpretation of the Terms and Conditions, judgment should have entered for Nissan, or a trial should be held. To identify the basis for the California judgment, the District Court considered only the facts discernible from the face of the California verdict form, when it should have consulted the broader California record, including the post-trial and appellate rulings. For any remaining ambiguity, the solution was a trial, not judgment against Nissan.

Finally, in dismissing Nissan's claim for its California attorney's fees, the District Court ruled on a basis different from what Continental asserted, and that would not justify summary judgment in its own right.

The judgment for Continental should be reversed, and judgment entered in favor of Nissan. At the very least, the case should be remanded for trial.

## B. Factual Background

### 1. The X61A program and its brakes.

In late 2003, a new collection of vehicles began rolling off the assembly line of Nissan's Canton, Mississippi, plant. Denominated internally as the "X61A" program, these were the Titan pickup truck and the Nissan Armada and Infiniti QX56 full-size SUVs.[2] (Yakushi Dep., RE 211-1, 10–11.[3])

Like any vehicle line, the X61A needed brakes. Nissan manufactures cars, not brakes: those it buys from suppliers. (*See* Smith Dep., RE 208-16, PID 10201–03.) Continental Teves, a division of Continental AG,[4] had actively marketed its brakes to Nissan for the X61A. (Brake Powerpt., RE 87-2, 1; Brake Powerpt, RE 87-5, 1.) Continental's marketing promoted its "optimized hydraulic braking," or "OHB," system. (OHB Powerpt., RE 87-1, 1–11; Schulenburg Ltr., RE 87-3, 1.)

---

[2] Within the program the SUVs were designated "WZW" and the Titan "ZW." (Athreya Dep., RE 208-25, PID 11293.)

[3] Many of the exhibits were filed under seal and do not contain PageID numbers. These are pincited to the internal document page, without a preceding "PID."

[4] The Defendant-Appellee is the successor to the entity that sold parts to Nissan. Because the respective identities of the various Continental affiliates are not pertinent, they are referenced without differentiation as "Continental."

Federal regulations require passenger vehicles to meet stopping-distance thresholds even with their primary brake-assist feature disabled. *See* 49 C.F.R. § 571.135. Like most vehicles of its time, the X61A's primary brake-assist mechanism employed vacuum generated by the car's engine. (Smith 2016 Dep., RE 78-1, PID 3323; *Cruz* R., RE 209-36, PID 14845.) The engine pulled the air from one side of a drum-like mechanism known as a "booster." A diaphragm inside the booster made that side airtight, and when the driver stepped on the brake pedal, a rod attached to the diaphragm applied force to the master cylinder on the booster's far side; the vacuum pulled on the membrane, multiplying the force. (Brake Powerpt., RE 87-5, 11; Russell 2021 Dep., RE 208-27, PID 11814.) The amount of force applied inside the master cylinder was transferred, via the brake fluid, to the wheel ends to squeeze the calipers against the turning rotors. (*Cruz* R., RE 209-38, PID 14993–95; Beaver Dep., RE 208-13, PID 9703–05.)

Without the extra force obtained from the vacuum booster, the calipers at the wheels cannot squeeze harder than the driver can push on the brake pedal. (Smith Dep., RE 208-16, PID 10250.) As a result, the Armada and QX56 prototypes passed the FMVSS threshold on foot power

alone, but not by Nissan's internal margin requirement. (Takahashi Trans., RE 192-6, PID 7831–32; *see* Smith Dep., RE 208-14, PID 10032.) Those vehicles needed a braking failsafe. (The Titan passed the internal margin; the failsafe was an optional feature there. (Smith Dep., RE 208-16, PID 13047–48.))

Enter OHB. Continental developed OHB as an additional function for its anti-lock-brake apparatus. (Beaver Dep., RE 211-1, 34–36; Solicitation Letter, RE 87-14, 1.) In ABS mode, that system rapidly cycles a pump connected to the brake lines to prevent lockup. (Beaver Dep., RE 208-13, PID 9762.) For OHB, the pump instead increases the pressure in the lines—and thus the force applied to the calipers at the wheel ends. (*Id.*, PID 9688–89; Smith Dep., RE 208-14, PID 9942; VDC Outline, RE 87-6, 11–13.) With the extra force, the X61A full-size SUVs met Nissan's internal standards for fail-safe braking. (Smith Dep, RE 208-14, PID 10048.) Because OHB employed the ABS pump and entailed a sudden increase in hydraulic pressure in the brake lines, it could generate noise and pedal feedback similar to anti-lock braking. (Beaver Dep., RE 208-13, PID 9830.) Some of that was inevitable. (*Id.*) Continental viewed it as a feature, not a bug, alerting the driver that the brakes had

malfunctioned. (*Id.*, PID 9831; Russell 2017 Dep., RE 211-35, 136–37; *see* Smith Dep., RE 208-16, PID 10331.)

Nissan Motor Co. Ltd., the Japanese parent of the Plaintiff Nissan entity, elected to put OHB in all model-year 2004 QX56 and Armada SUVs and certain Titan trim packages. (Takahashi Trans., RE 208-6, PID 8680–81.) So it purchased the requisite Continental parts: the booster, with attached master cylinder, and an electronic control unit, or "ECU," integrated with the ABS pump (Sourcing Docs., RE 23-1, PID 365–426), along with a wheel-speed sensor. (*Id.*; *see* Renderings, RE 69-3, PID 3180–81.) The ECU housed a computer running Continental software controlling the ABS and OHB functions. (Smith Dep., RE 208-16, PID 10247–48, 10344.) Nissan did not write and could not modify this software. (*Id.* at PID 10342–45.)

## 2. Nissan buys Continental parts via purchase orders.

Nissan's purchasing department in Smyrna, Tennessee, issued purchase orders to Continental's offices in Michigan, which Continental fulfilled out of its production facility in North Carolina. (POs, RE 180-4, PID 7587–98.) At the time, Nissan's purchasing department generated its purchase orders on paper, running off four-part carbonless-copy packets

on tractor-fed impact printers. (Meltzer Dep., RE 208-10, PID 9453–54; Meltzer Decl., RE 24, PID 516–17.) From each packet, two copies went to the supplier, one copy to Nissan accounting, and one copy (pink) stayed in purchasing. (Garner Decl., RE 84-6, PID 3473; Meltzer Dep., RE 208-10, PID 9418–20.) Each contained identical preprinted text on the front (except for one line identifying which sheet in the packet it was) and, being on carbonless-copy paper, received an identical imprint of the order-specific information entered by the buyer. (Meltzer Dep., RE 208-10, PID 9453–54; *see* Ferrel Decl., RE 208-5, PID 8667–74.)

A legend at the bottom made Continental's acceptance subject to Nissan's stated Terms and Conditions:

THIS PURCHASE ORDER EXPRESSLY LIMITS ACCEPTANCE TO THE TERMS AND CONDITIONS STATED HEREIN.

(POs, RE 180-4, PID 7587; PO Template, RE 24-2, PID 530.) The two copies sent to the supplier contained Terms and Conditions, under that label, on the reverse.[5] (Meltzer Decl., RE 24, PID 516–17; Other POs, RE 180-5, PID 7600, 7602; Pinnekamp Decl., RE 25, PID 532–33; 2d Pinnekamp Decl., RE 208-4, PID 8656–66; T&C Summ., RE 180-1, PID

---

[5] At the relevant time the pink purchasing file copies did not have the Terms and Conditions on the reverse. (*See* Ferrel Decl., RE 208-5, PID 8668.)

7569.)

The Terms and Conditions allocated various risks between Continental and Nissan. In Paragraph 8, Continental accepted liability for costs and expenses arising from recalls, damage to other parts, and third-party claims of personal injury or property damage:

> In addition to what is specified elsewhere on the document, **Seller's liability shall also include** [1] all cost incurred as a result of vehicle **recall** programs pursuant to NTMVSA, [2] damage or cost due to problems developed in **other parts** resulting from defective parts supplied by Seller, and [3] damages or cost arising from **claims of personal injury or property damages** caused directly or indirectly by defective parts supplied by Seller. Nissan shall have available to it all other remedies implied or provided for by law.

(PO Template, RE 24-2, PID 531.[6]) Elsewhere, Continental assumed liability for breach of warranty, damages to Nissan's property, intellectual-property claims, and injuries suffered during its work. (*Id.* ¶¶ 7, 11, 12, 17.)

Nissan issued the first purchase orders for Continental's X61A parts in the summer of 2003. (POs, RE 180-4, PID 7588, 7590, 7592–93, 7595, 7597; Kimmel Dep., RE 208-11, PID 9551–52.) Continental filled the

---

[6] Throughout, unless otherwise noted, all emphasis and alterations are added, and all internal quotation marks, citations, and brackets omitted.

orders; there is no evidence the parties made an agreement governing them other than those on the purchase orders. (Kimmel Dep., RE 208-11, PID 9552; Stmt. of Facts, RE 64, PID 3000 ¶ 23.)

### 3. The Delta Stroke Sensor

For a failsafe to work, it needs a switch to activate it. In Continental's OHB system, that switch relied on a delta stroke sensor, or "DSS," located inside the booster housing. (*Cruz* R., RE 209-37, PID 14854–55.) The DSS, a magnet and spring in a plastic frame, measured movement of booster components as a proxy for the presence of vacuum: i.e., is the membrane moving the way it would if vacuum were present, or not? (*Id.*; Beaver Dep., RE 208-13, PID 9750–53.) The DSS sent an electrical signal to the ECU; there, Continental's software interpreted the signal and used its internal instructions to activate OHB (or not) based on the interpretation. (*Cruz* R., RE 209-37, PID 14857–60.)

Continental's DSS and its ECU software, however, proved finnicky. Continental had programmed the software, in its words, to be insufficiently "robust." (Beaver Dep., RE 208-13, PID 9840–45.) As a result, the software incorrectly interpreted some DSS signals as reflecting a loss of sensor function that had not in fact occurred: i.e., the ECU could

incorrectly conclude that a functioning DSS had failed. (*Id.*) This occurred because Continental calibrated the software to accept DSS signals within a specified range, but the calibration range was narrower than the range of real-world signals. (*Id.*; *see Cruz* Op., RE 55-6, PID 948.)

The tendency of sensors like the DSS to "drift" exacerbated the problem. "Drift," a shifting of the physical components beyond their preset tolerance, changed the components' relative movement and the resulting signal. (Beaver Dep., RE 208-13, PID 9854–55.) A DSS suffering from drift was especially prone to send a signal outside the factory calibration tolerance. (*Cruz* Op., RE 55-6, PID 946.) When the ECU received such a signal, it set the diagnostic trouble code reflecting DSS failure: "C1179." (*Id.*; *see also* Beaver Dep., RE 208-13, PID 9855–56.) The ECU could thus generate "false" C1179 codes—false because the code reflected a sensor failure when none had occurred. (*Cruz* Op., RE 55-6, PID 946.)

In X61A vehicles, if the driver stepped on the brake while the ECU was registering a C1179, OHB would activate. (Russell Dep., 208-27, 11833–35, 11876–85; Russell 2017 Dep., 211-35, 58; *Cruz* Pls.' Trial Br., RE 208-3, PID 8640.) In consultation with Continental during the design process, Nissan engineers had asked Continental to program the ECU

software to activate OHB in that circumstance to protect against the risk of booster failure—and corresponding loss of braking power—coinciding with a sensor malfunction. (Beaver Dep., RE 208-13, PID 9689–96; *Cruz* R., RE 209-25, PID 13744; Smith Dep., RE 211-14, 234–37.)

### 4. The DSS experiences high repair rates: Continental develops a software fix, but customer litigation ensues.

The 2004 X61A vehicles soon began displaying greater-than-anticipated repair rates for C1179 codes. (*Cruz* R. RE 209-20, PID 13371–72.) Some drivers reported that their brakes stopped functioning when the vehicle threw a C1179 and entered OHB mode. (*Id.*; *Cruz* Pls.' Trial Br., RE 208-3, PID 8641.) Nissan and Continental dispatched field teams to investigate, but they were never able to replicate the reported brake failure: all the tests showed a vehicle stopped at least as fast in OHB as in normal braking mode. (Smith Dep., RE 208-16, PID 10328–30; Swan Dep., RE 208-18, PID 10683–86.)

During the investigation, Nissan issued an ICAR—"important corrective action request"—to Continental, asking it to identify and fix whatever problem had caused the unexpected spike in C1179 codes. (Lawson Dep., RE 208-17, PID 10519; *Cruz* R., RE 209-20, PID 13373.)

Continental identified the DSS drift and related calibration and sensitivity problems with the ECU's software. (ICAR Resolution, RE 217-2, 1–2; Beaver Dep., RE 208-12, PID 9608–12.) It prepared a patch that allowed the ECU software to compensate for drift when interpreting DSS signals. (Russell 2017 Dep., RE 211-35, 183–85; Smith Dep., RE 211-14, 250–51; Beaver Dep., RE 208-12, PID 9608–12.) Nissan distributed the patch to dealers along with a Technical Service Bulletin telling service departments to "flash" the ECU software with the patch if a vehicle experienced a false C1179. (TSB, RE 84-7, PID 3475; *see* Lawson Dep., RE 211-16, 167–68.) Because neither Nissan nor Continental could connect false C1179 codes to a loss of brake power, Nissan did not issue a recall. (*Cruz* Pls.' Trial Br., RE 208-3, PID 8641–42; Smith Dep., RE 208-16, PID 10353–55.)

Litigants, however, began asserting the C1179 problem caused a loss of brake function. Class actions were filed in California and Arkansas. (*Banks* Compl., RE 23-3, PID 460–76; *West* Compl., RE 23-4, PID 477–95.) Continental defended and funded settlement of the class actions. (Sullivan Decl., RE 87-18, 4–5; Cont. Resp. to Stmt. of Facts, RE 97, ¶¶ 12–16.)

### 5. A 2012 crash in California leads to personal-injury claims against Nissan and Continental for alleged defects in Continental-supplied brake components.

On August 29, 2012, Mr. Solomon Mathenge was driving a used but new-to-him 2004 QX56 northbound on Highland Avenue in Los Angeles. (*Cruz* Pls.' Trial Br., RE 208-3, PID 8638-639.) He later testified that he tried to slow down approaching a red light, but began "having problems with the brakes." (*Cruz* R., RE 209-20, PID 13393.) Rather than decelerating, the vehicle "sped up and [went] wild." (*Id.*) Mr. Mathenge swerved into the southbound lanes on Highland Avenue, entered an intersection against a red light, and t-boned a westbound minivan; all three minivan occupants died. (*Cruz* Compl., RE 43-4, PID 799–800.)

The decedents' next of kin sued Mr. Mathenge in Los Angeles Superior Court. (*Cruz* Pls.' Trial Br., RE 208-3, PID 8638.) The LAPD could not find a mechanical fault in the QX56's brakes, so the DA charged Mr. Mathenge with vehicular manslaughter. (*Id.*, PID 8639.) But when one of Mr. Mathenge's relatives saw a news story about the X61A class-action settlements, further investigation revealed a C1179 code stored in the QX56's ECU. (*Id.*, PID 8638–40.) The DA dropped the manslaughter charge (*Cruz* R., RE 209-14, PID 12917), and Mr. Mathenge and the

survivors sued Nissan and Continental, claiming their injuries were caused by defective Continental-supplied components in Mr. Mathenge's QX56.[7] (*Cruz* Op., RE 55-6, PID 948; *Cruz* Trial Br., RE 208-3, PID 8638; *Cruz* Compl., RE 43-4, PID 776–77; Mathenge Compl., RE 43-5, PID 805–23.)

### 6. The *Cruz* Plaintiffs allege a design defect in the ECU and DSS and obtain a $24 million verdict against Nissan.

Throughout *Cruz*, the plaintiffs reiterated their theory that Continental-supplied parts in Mr. Mathenge's vehicle were defective. For example, they avoided the statute of limitations by showing they had only recently learned of alleged problems with Continental's DSS, not the QX56 brakes overall.[8] (*Cruz* R., RE 209-4, PID 12176–80; *Cruz* Op., RE 55-6, PID 955–57.) They also withstood Continental's summary-judgment motion by highlighting evidence that Continental's ECU software was defective because it was "prone to falsely reporting a [C1179] delta stroke sensor error." (*Cruz* R., RE 209-6, PID 12323–24, 12303–27.)

---

[7] Below, the parties frequently referred to that case as "*Bernardino*," after a different plaintiff in the consolidated action. This brief follows the lead of the California caption in using "*Cruz*."

[8] Similar proof was introduced at trial. (*Cruz* R., RE 209-32 PID 14392–93.)

*Cruz* approached trial in June 2017. The plaintiffs' trial brief left no ambiguity that they blamed their injuries on a Continental-supplied part:

> 1.   **Theory of Liability**
>
> All Plaintiffs have brought claims on behalf of themselves and the decedents against Defendant Nissan North America, Inc., the designer and manufacturer of Mathenge's defective QX56, and Defendant Continental Automotive Systems, Inc., the designer, manufacturer, and supplier of the defective braking components.

(*Cruz* Trial Br., RE 208-3, PID 8638.)

Moments before voir dire, Continental settled. (*Cruz* R., RE 209-15, PID 12922–29.) Nissan stipulated that the settlement was in "good-faith" under California law, precluding a subsequent claim against Continental for contribution or implied indemnity rooted in comparative fault, but not for contractual indemnity. (*Cruz* Stip., RE 64-11, PID 3066.) *See* Cal. Civ. Proc. Code § 877.

Yet at trial the *Cruz* plaintiffs remained focused on allegedly defective Continental-supplied parts. They told the jury that the crash occurred because the car threw a false C1179, entered OHB mode, and Mr. Mathenge panicked in response to the changed brake performance. (*Cruz* R., RE 209-43 PID 15386–87.) Their expert blamed OHB activation on

the convergence of two aspects of the ECU software: the activation strategy (turning on OHB in response to a C1179) and its signal-interpretation problem (generating the C1179 in the first place). (*Cruz* R., RE 209-25, PID 13745–46.) Plaintiffs' counsel revisited the theme in closing, describing how Continental's software patch would have prevented the C1179 in Mr. Mathenge's car, and explaining why the C1179 likely occurred right before the accident. (*Cruz* R., RE 209-42, PID 15366, 15374–76.)

Plaintiffs' counsel made their software-defect theory plain when discussing the verdict form: "Was the design of the braking system in *the OHB strategy and C1179* a substantial factor in the deaths of [the decedents]? That's the question. And the answer is yes." (*Id.* at PID 15374.) Per the plaintiffs' expert testimony, their theory required both the strategy and the C1179-producing bug: neither alone would activate OHB, only both together. (*Cruz* R., RE 209-6, PID 12304–05, 12312, 12323–24.)

The jury found that a design defect in the braking system caused the plaintiffs' injuries, and it awarded over $24 million in compensatory damages against Nissan. (*Cruz* R., RE 209-45, PID 15495–500; Verdict Form, RE 55-2, PID 920–25.)

## 7. The California courts uphold the plaintiffs' verdict, and Nissan satisfies the judgment.

The Superior Court denied Nissan's post-trial motions, including a motion for judgment notwithstanding the verdict directed at causation. Judge Hammock found the plaintiffs had proven a design defect in Continental's ECU software:

```
        ONE OF THE BETTER PARTS OF THEIR CASE, IN MY
OPINION, IN WHICH I WOULD HAVE VOTED OVERWHELMINGLY ABOUT
IS THAT THEY DID PROVE A DESIGN DEFECT OF THE INITIAL
SOFTWARE THAT WAS IN THESE VEHICLES, IN MY OPINION, THROUGH
THAT DR. K'S TESTIMONY.
        SO WHAT DO YOU DO WITH THAT?  SO WE KNOW THERE ARE
FALSE POSITIVES, RIGHT, THROUGH A DESIGN DEFECT.  I BELIEVE
THAT WAS PROVED BEYOND A REASONABLE DOUBT THAT IS HOW
STRONGLY I FEEL, OR THEY PROVED THAT ONE.  OR IF YOU ASK ME
TO WEIGH IT AS THE 13TH JUROR, THEY PROVED THAT.
```

(*Cruz* R., RE 209-46, PID 15574–75; [9] *see Cruz* Final Rulings, RE 55-3, PID 927.) The Superior Court did, however, give Nissan a $3.3 million credit for Continental's settlement payment. (*Cruz* Final Rulings, RE 55-3, PID 928–30; Resp. to Stmt. of Facts ¶ 11, RE 64, PID 2995.) The court allowed the credit because under California law Nissan (as the

---

[9] Judge Hammock went on to note the plaintiffs' expert testimony implicating the activation strategy along with the signal-interpretation error. (*Cruz* R., RE 209-46, PID 15577–78; *cf. Cruz* R., RE 209-25, PID 13745–46.)

- 22 -

manufacturer of the vehicle) and Continental (as the supplier of the defective component) would have been jointly and severally liable. (*Cruz Final Rulings*, RE 55-3, PID 928–30.) Judge Hammock concluded that, although the jury had also found in plaintiffs' favor on a negligent-failure-to-recall claim, none of the recovery was attributable to that claim. (*Id.* at PID 929.) Indeed, the plaintiffs had conceded the recall claim depended on the defect claim and was just a hook for punitive damages. (*Cruz* R., 209-9, PID 12508–10; *Cruz* R., RE 209-41, PID 15307–10.)

The California Court of Appeal affirmed in full. It highlighted the same software-defect evidence, which it framed as showing a defect in the "calibration" related to the DSS that caused the software to "send[] a false C1179 code, which activated OHB mode." (*Cruz* Op., RE 55-6, PID 955.) The appellate court likewise affirmed the settlement credit, agreeing that because Continental had been sued for supplying the defective parts, "the liability common to [the defendants] was fully joint and several." (*Id.* at PID 962.)

Nissan paid $26,054,107.80 to satisfy the *Cruz* judgment (including costs, interest, etc.). (Barnett Decl., RE 56 PID 963; Acknowledgment, RE 55-4, PID 937; Acknowledgment, RE 55-5, PID 941–42.) In addition,

Nissan incurred trial and appellate litigation expenses, including attorney's fees, exceeding $6,000,000. (Barnett Decl., RE 56, PID 963; Berry Dep., RE 211-18, 33–34.)

## C. Procedural Background.

Nissan sued Continental in a Tennessee state court, initially seeking indemnification under the parties' Master Purchase Agreement ("MPA"), which governed most of their dealings on the X61A program. (Compl., RE 1-1, PID 13.) After Continental removed the case (Nots. Removal, RE 1, 13, PID 1, 179), Nissan amended its complaint to add an alternative claim for indemnification under the purchase orders' Terms and Conditions. (Am. Compl., RE 43, PID 697.)

The parties cross-moved for summary judgment, focusing mainly on the MPA's application. (Nissan R.56 Mot., RE 55, PID 910; Cont. R.56 Mot., RE 67, PID 3131.) The District Court held the MPA inapplicable, because it post-dated the production of Mr. Mathenge's QX56, and dismissed the two defendants who were not parties to the purchase orders. (Memo., RE 120, PID 6137–38; Order, RE 121, PID 6139.) The District Court denied Continental's motion with respect to Nissan's claim under the purchase orders. (Memo., RE 120, PID 6134–35.)

After further discovery, the parties again cross-moved for summary judgment. (Nissan R.56 Mot., RE 187, PID 7650; Cont. R.56 Mot., RE 190, PID 7733.) Nissan argued (1) the Terms and Conditions controlled; (2) under their Paragraph 8, Continental had agreed to assume liability for claims that defects in its parts had caused injuries; and (3) the record and rulings in *Cruz* showed such claims had caused Nissan's losses. (Nissan Mot., RE 187, PID 7650.) Continental insisted that (1) the Terms and Conditions did not apply; (2) Nissan was required to (and could not) prove that an actual defect in its components had actually caused the accident in *Cruz*; and (3) the Terms and Conditions, if applicable, did not allow recovery of the *Cruz* attorney's fees. (Cont. Memo., RE 191, PID 7739, 7759–62.)

The District Court denied Nissan's motion, granted Continental's, and entered a final order dismissing Nissan's claims. (Memo., RE 223, PID 19840; Order, RE 224, PID 19852; Judgment, RE 225, PID 19853.) The court agreed with Nissan that the Terms and Conditions in its purchase orders were incorporated into the parties' agreement. But it interpreted Paragraph 8 as permitting Nissan to recover only if it proved that "a defective Continental part led to the … collision." (Memo., RE 223, PID

19848.) And it concluded the *Cruz* judgment did not preclusively establish any "true facts" to this effect. (*Id*. at PID 18946–49.) Finally, the District Court dismissed Nissan's claims for *Cruz* litigation expenses because Nissan had not "allocate[ed] any costs or fees specifically to a Continental defect," even though Continental had not moved for summary judgment on that basis. (*Id*. at PID 19850 n.6.)

Nissan timely appealed. (Not. of App., RE 226, PID 19854.)

## SUMMARY OF ARGUMENT

Rather than affirm Nissan's right to obtain indemnification from Continental, or at least deny the parties' cross-motions for summary judgment and leave the decision to the jury, the District Court ruled against Nissan and granted Continental's motion. This Court should reverse, or at least vacate and remand for trial, for three reasons.

First, applying Tennessee contract-interpretation authority shows Continental agreed to indemnify Nissan for damages and costs incurred when a third party claims to have been injured by defects in Continental-supplied parts. The *Cruz* trial and appellate record confirms that Nissan incurred "damages or cost arising from *claims*" that brake parts provided by Continental were defective. So this Court should reverse. If nothing else, a reasonable jury could reach this conclusion, which would warrant vacatur and remand.

Second, even under the District Court's interpretation of what Nissan must prove for contractual indemnification, the *Cruz* record—when considered in full, as required—confirms that Nissan incurred damages and costs arising from a jury finding that the *Cruz* plaintiffs' injuries were caused by defective brake parts supplied by Continental. The *Cruz*

plaintiffs litigated their claim against Nissan on that theory, before and after Continental settled. The *Cruz* jury returned a verdict for plaintiffs on that theory. And the *Cruz* trial and appellate courts upheld it on that theory, even offsetting Nissan's liability with Continental's settlement, on the basis the plaintiffs' injuries were caused by Continental's defective parts. Those rulings bind Continental under Tennessee law, as contractual indemnitor, and should have been applied to enter summary judgment for Nissan. But even if the *Cruz* record were too ambiguous to apply on summary judgment, Continental's motion should have been denied and the issue set for trial.

Third, just as Continental incurred costs in defending the *Cruz* claims that its parts were defective, Nissan did, too. Yet, without notice to Nissan, the District Court granted Continental summary judgment concerning Nissan's defense costs because Nissan failed to allocate among claims the legal fees and expenses it incurred defending *Cruz*. But no such allocation is required at the summary judgment stage. Even if it were, the District Court was mistaken to enter summary judgment on this basis without first providing Nissan the opportunity to brief and address the issue.

This Court should reverse the District Court's rulings and direct it to enter summary judgment in Nissan's favor, or at minimum, vacate and remand for a trial on any disputed issues of fact.

# ARGUMENT

## 1. Governing law and standard of review

### 1.1. This Court reviews summary judgment rulings de novo, considering each motion independently.

The District Court disposed of this case by denying Nissan's motion, and granting Continental's cross-motion, for summary judgment. This Court reviews those decisions de novo. *Graham-Humphreys v. Memphis Brooks Museum of Art Inc.*, 209 F.3d 552, 554 n.7 (6th Cir. 2000). Summary judgment was permissible only if the record would require a reasonable trier of fact to resolve the case in favor of Continental. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249 (1986).

The presence of cross-motions does not dictate the entry of summary judgment: each motion requires evaluation on its own merits. *See Ferro Corp. v. Cookson Grp. PLC*, 585 F.3d 946, 949–50 (6th Cir. 2009). If that evaluation shows "that neither party met its burden of demonstrating that no genuine issue of fact existed," the case should go to trial. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir. 2001).

### 1.2.  Tennessee law controls the parties' contract and California law controls the *Cruz* judgment.

The parties' contract selects Tennessee's as the governing law. (PO Template ¶ 23, RE 24-2, PID 531.) Federal courts "generally enforce the parties' contractual choice [of law]." *Savedoff v. Access Grp. Inc.*, 524 F.3d 754, 762 (6th Cir. 2008). Where state law is uncertain, this Court must predict how the state's supreme court would rule. *See Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004). The Court construes the *Cruz* judgment under California law. *See Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 373 (1996) ("[I]n determining the effect of state judgments, [federal courts] must accept the rules chosen by the [issuing] State."). California makes a judgment's effect generally a question of law, *see Shuler v. Capital Agr. Prop. Servs. Inc.*, 49 Cal. App. 5th 62, 68 (2020), calling for de novo review, *see McQueen v. Williams*, 177 F.3d 523, 527 (6th Cir. 1999), *but see infra* at 63.

### 1.3.  This Court reviews the District Court's *sua sponte* decision to grant summary judgment on litigation expenses for an abuse of discretion and the disposition itself de novo.

The District Court dismissed Nissan's claims for *Cruz* litigation expenses, granting Continental summary judgment on a ground it never

raised. *See* Part 4, *infra*. That decision triggers a two-tiered review. The procedural decision to enter summary judgment *sua sponte* garners review for an abuse of discretion. *Bennett v. City of Eastpointe*, 410 F.3d 810, 816 (6th Cir. 2005). The decision qualifies as an abuse if the losing party lacked "notice that it had to come forward with all of its evidence and … a reasonable opportunity to respond to all issues [being] considered." *Id.* If the Court affirms the procedural decision, it reviews the substantive decision de novo. *Id.*

## 2. The Terms and Conditions obligate Continental to reimburse Nissan for damages and costs caused by claims that Continental's parts were injuriously defective.

The parties' contract—purchase orders incorporating Terms and Conditions—required Continental to reimburse Nissan for the damages and expenses "arising from" the claims in *Cruz*. (*See* Memo., RE 223, PID 19840–43 (holding purchase orders govern).) Under Tennessee law, the plain meaning of the contract's language requires Continental to reimburse Nissan, because the *Cruz* plaintiffs *claimed* Continental's defective parts injured them and Nissan has proven it paid damages and costs as a result of that claim. The contract does not, contrary to the District

Court's ruling, require Nissan to prove that Continental's parts were defective and caused the *Cruz* plaintiffs' injuries.

## 2.1. Under Tennessee law, the contract's plain terms govern.

In Tennessee, the "cardinal rule" in interpreting contracts "is to ascertain … and … give effect to" the parties' intention. *Bob Pearsall Motors Inc. v. Regal Chrysler-Plymouth Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975). Courts ascertain that intention primarily from the terms of the agreement. *See Individual Healthcare Specialists Inc. v. BlueCross BlueShield of Tenn. Inc.* (*IHS*), 566 S.W.3d 671, 694 (Tenn. 2019). If unambiguous, the terms' meaning is a question of law. *E.g.*, *id.* at 689–92. Interpretation must account for each word and provision, "without rendering portions of [the contract] neutralized or without effect." *Maggart v. Almany Realtors Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008). Courts also apply "the general rules of gramma[r]." *Moorehead v. Tenn. Farmers Mut. Ins. Co.,* No. M2020-1319, 2021 WL 2935454, at *5 (Tenn. Ct. App. July 13, 2021). These principles apply with equal force to indemnification provisions. *See Trinity Indus. Inc. v. McKinnon Bridge Co.*, 147 S.W.3d 225, 234 (Tenn. Ct. App. 2003).

## 2.2. The plain meaning of Paragraph 8 ties Continental's obligation to the theory of a claim.

Continental's duty to reimburse Nissan for the costs and damages incurred in *Cruz* arises from the third obligation Continental assumed in Paragraph 8:

> In addition to what is specified elsewhere on the document, [Continental]'s *liability shall also include* [1] all cost incurred as a result of vehicle recall programs pursuant to NTMVSA, [2] damage or cost due to problems developed in other parts resulting from defective parts supplied by Seller, and [3] *damages or cost arising from claims of personal injury or property damages caused directly or indirectly by defective parts supplied by* [Continental]. Nissan shall have available to it all other remedies implied or provided for by law.

(PO Template, RE 24-2, PID 531; Stmt. of Facts ¶ 23, RE 64, PID 3000; Kimmel Dep., RE 208-11, PID 9555.) Hence, Continental is liable to Nissan for "damages or cost" arising from "claims."  The rest of the phrase ("of personal injury caused directly or indirectly by defective parts") specifies what kinds of claims Continental must reimburse. It is thus the theory of a third party's claim, not the real-world cause of an injury, that determines Continental's liability.

Deconstructing the sentence grammatically bears out this meaning. First, omit extraneous clauses and consolidate compound terms to reduce the text to its essential elements: "Seller's liability shall … include … damages … arising from claims of personal injury[10] … caused directly or indirectly by defective parts supplied by Seller."

Now examine it piece by piece.[11] Continental is liable for "damages." A participial phrase[12] ("arising from"—a prepositional verb[13]—"claims") acts as an adjective modifying "damages." Then "of injury," a prepositional phrase,[14] describes the "claims"[15] (they are claims of injury). Another participial phrase ("caused by defective parts") tells the reader what kinds of injuries must be specified in the claims (claims of injuries caused by defective parts). Thus, in the text, the "injury" is something being "claim[ed]." That means the later reference to the injury's cause

---

[10] Omitting "or cost" and "or property damages" is syntactically inconsequential, as the words on either side of "or" are modified alike. *See Chicago Manual of Style* ¶ 5.175 (16th ed. 2010) (*CMS*).

[11]  *See* App'x B for all provisions cited in this discussion.

[12] *See* Bryan A. Garner, *The Chicago Guide to Grammar, Usage, and Punctuation* ¶¶ 151, 154 (2016); *see also* Randolph Quirk et al., *A Comprehensive Grammar of the English Language* ¶¶ 7.15, 7.21, 17.100–03 (2010).

[13] *See* Quirk ¶¶ 16.2, 16.6.

[14] *See CMS* ¶ 5.169 (16th ed. 2010).

[15] *See* Garner ¶¶ 247–49, 297–98.

("caused ... by defective parts") must refer to what is *claimed* to have brought about the injury.

The sentence diagram[16] below shows graphically how the words fit together and how "caused by" comes downstream from "claims," modifying "[claimed] injury," not "damages":



The words "claims of" matter. They obligate Continental to reimburse Nissan when it incurs costs arising from a third party's *claim* to have been injured by a defective Continental part, without requiring

---

[16] *See* Garner ¶¶ 339–64; John E. Warriner, *English Composition and Grammar: Third Course* 393–97 (1988) (fundamentals of diagramming). The diagram omits "supplied by Seller" for legibility's sake, but it too is a participial phrase.

proof of *actual* injury or defect. They thus shift and simplify the inquiry in an indemnification action between Nissan and Continental, *see* Part 2.3, *infra*, requiring proof only that Nissan's damages arose from a qualifying claim, saving both parties the expense and difficulty of litigating a personal-injury case within a contract case.

The District Court's reading, which effectively applies "caused by … parts" to "damages or cost," renders "claims of" nugatory. If, as the District Court read it, the language required proof an *actual* defect generated the claim, it would be indistinguishable from a provision making Continental liable for "damages … arising from personal injury … *caused* … *by defective parts* supplied by Seller." This causation-in-fact requirement thus reads a material word out of the contract, something principles of construction prohibit. *See Maggart*, 259 S.W.3d at 704; *Vantage Tech. LLC v. Cross*, 17 S.W.3d 637, 650 (Tenn. Ct. App. 1999) ("Contracts must be construed, as far as is reasonable, so as to give effect to every term.").

The District Court's reading also poses two other grammatical problems:

*First*, it imposes two meanings on the single word "injury," impossibly making it both a real injury and a claimed injury simultaneously. *See*

*Clark v. Martinez*, 543 U.S. 371, 378 (2005); *Lewisburg & Nashville R.R. v. Hinds*, 183 S.W. 985, 990 (Tenn. 1916) (both refusing to read multiple meanings into single term).

Second, it applies modifiers to unreasonable, distant referents. A modifier grammatically applies to the nearest reasonable referent, generally the one immediately preceding it. *See, e.g.*, *Fakhouri v. Ober Gatlinburg Inc.*, 821 F.3d 719, 721–22 (6th Cir. 2016) (applying principle to hold "associated with Alpine or downhill skiing" modified immediately preceding "tramways," not the more remote verb "use") (citing Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 152 (2012)); *see also Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) ("[A] limiting … phrase ... should ordinarily be read as modifying only the noun or phrase that it immediately follows."); *accord* Quirk ¶¶ 17.21, 17.100–03 (discussing placement of modifiers before and after words).

Thus "damages" must be modified by "arising from claims," as "damages" is its nearest (indeed adjacent) reasonable referent. "[D]amages" thus cannot be the referent of "caused … by … parts." It is certainly not nearest—both "claims" and "personal injury or property damage" lie in between. (PO Template, RE 24-2, PID 531.) And the "arising from"

modifier already supplies a causation requirement for "damages." *See Whitley v. White*, 140 S.W.2d 157, 162 (Tenn. 1940) ("The terms arising from … connote source, relate back to and tie up with origin, basis, cause."). "[C]aused by parts," therefore, can only refer to the alleged causation, within a claim, for a claimed injury.[17] Only Nissan's construction—requiring only a claim of defect and a claim of causation—is reasonable and gives effect to the words "claims of" in Paragraph 8.

Giving effect to the words "claims of" also avoids absurdity. Without "claims," Nissan could never recoup costs incurred successfully defending personal-injury claims directed at Continental's parts; Nissan would be better off losing, an incongruous result with perverse incentives. *Cf. Employers Reinsurance Corp. v. Mid-Continent Cas. Co.*, 358 F.3d 757, 771 (10th Cir. 2004) ("We are reinforced in this interpretation … by the observation that adopting MCCC's … would create a perverse incentive [to

---

[17] Note also that "parts" may "cause[]" the injury "directly or indirectly." The language thus encompasses scenarios in which a third party claims the parts cooperated with some other cause to produce an injury. *Metro. Life Ins. Co. v. Smith*, 554 S.W.2d 123, 126, 128 (Tenn. 1977) (holding "resulted directly or indirectly from … disease" encompassed circumstances in which disease was one of multiple contributing causes); *Britton v. Prudential Ins. Co. of Am.*, 205 Tenn. 726, 735–36 (1959) (same). Whether other forces or parts played a role alongside Continental's parts in the *Cruz* allegations is thus irrelevant. *Cf.* Part 3.4.

refuse to pay claims].”); *see Pullman Standard Inc. v. Abex Corp.,* 693 S.W.2d 336, 338 (Tenn. 1985) (rejecting interpretation of implied-indemnity obligation that would "penalize a party for successfully defending the allegations against it.").

In short, Continental accepted liability for damages that Nissan shows arise from a qualifying claim: one that alleges an injury caused directly or indirectly by a defect in parts Continental supplied. Because the District Court disregarded the plain terms and grammatical structure of Paragraph 8, thereby rendering the central term "claims" ineffectual, it erred. *See IHS*, 566 S.W.3d at 689–92.

### 2.3. The parties' relationship and other portions of the Terms and Conditions reinforce the plain meaning of Paragraph 8.

The Court can gain extra confidence in this interpretation from two sources.

First, the relationship between Continental and Nissan reinforces the plain-text analysis. A court may consult "the facts and circumstances surrounding the contract's execution as an aid in … construction." *IHS*, 566 S.W.3d at 699. Courts are "entitled to place themselves in the same situation as the [contracting] parties," and that perspective may buttress

"a meaning consistent with that to which [the contract's terms] are reasonably susceptible." *Id.* at 697, 699.

Here, Continental marketed itself to Nissan as a brake specialist and sold Nissan an array of interrelated mechanical and electrical components employing proprietary sensors and software to run braking functions Continental had designed and pitched. (Russell 2017 Dep., RE 80-1, 201–02; Brake Prop'l, RE 87-5, 3–4; Takahashi Trans., RE 208-6, PID 8681.) Continental then helped Nissan incorporate those parts and functions into its vehicles. (Tominaga Trans., RE 208-8, PID 9079–80, 9137; Smith Dep., RE 208-16, PID 10205.)

Continental's decision, in connection with its sales to Nissan, to accept the risks associated with third-party injury claims directed at its parts was both commercially reasonable and conventional. The ability of sophisticated parties to allocate such risks is a basic assumption of the law of contracts. *See Milan Supply Chain Sols. Inc. v. Navistar Inc.*, 627 S.W.3d 125, 152–55 (Tenn. 2021) (discussing role contractual allocation of fault plays in establishing line between tort and contract). These parties agreed in advance to apply Nissan terms and conditions. (*See* Sourcing Docs, RE 180-3, PID 7581–86.) And the ones employed reflect that

Continental was better positioned to assume the risks associated with third-party *claims* about its own parts.

Indeed, buyers and sellers routinely agree to allocate to the seller the risk of third-party claims. *See, e.g.*, *N. Ins. Co. of N.Y. v. Target Corp.*, 717 F. App'x 571, 572 (6th Cir. 2017) (discussing agreement providing "Vendor … shall … indemnify … Purchaser … against any and all liability … arising out of any claim … based upon … [various acts concerning] the Goods."). Sensibly, Tennessee law endorses these allocations. *See Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 892 (Tenn. 2002) ("This Court has consistently recognized that the right of parties to allocate liability … through indemnity clauses, generally, is not contrary to public policy."). So too does California's products-liability regime. *See Vandermark v. Ford Motor Co.*, 391 P.2d 168, 172 (Cal. 1964) ("Strict liability on [multiple parties in the chain of distribution] … works no injustice to the defendants, for they can adjust the costs of such protection between them.").

Second, the parties made the same allocation elsewhere in the agreement, in Paragraph 12. There too, Continental assumed the risk of claims, rather than of injuries, by agreeing to "investigate and deal with

every claim" that its parts infringe another's intellectual-property rights and to "pay all costs [etc.] … Nissan … may sustain by reason of any such claim …." (PO Template, RE 24-2, PID 531.) As the designer and manufacturer of its own parts, Continental was better situated to avoid intellectual-property claims—like defect claims—in the first instance. Both allocations spare the parties the need to relitigate an underlying third-party claim between them, while placing the risk on the party better situated to bear it. The use of the same framework elsewhere in the agreement underscores the commercial reasonableness, and therefore the propriety, of Nissan's interpretation of Paragraph 8. *See IHS*, 566 S.W.3d at 697–99; *cf. N. German Lloyd v. Guar. Trust Co.*, 244 U.S. 12, 24 (1917) (Holmes, J.) ("Business contracts must be construed with business sense.").

"The principal apparent purpose of the parties is given great weight in determining the meaning to be given to manifestations of intention or to any part thereof." *Hamblen Cnty. v. City of Morristown*, 656 S.W.2d 331, 334 (Tenn. 1983). Nissan and Continental's purpose was clear: to assign to Continental, rather than to Nissan, the risks associated with third-party claims targeting Continental's parts, without the need for

Nissan to re-prove those claims to obtain reimbursement. The plain terms of Paragraph 8 yield this result. The circumstances of the parties' dealings and other provisions of the Terms and Conditions reinforce it. The District Court's contrary interpretation should be reversed.

### 2.4. The District Court relied on inapposite cases interpreting language in form insurance contracts, divorced from the language in Paragraph 8.

The District Court read Paragraph 8 as obligating Continental to reimburse Nissan only upon proof that an actual defect had actually caused an injury. (Memo., RE 223, PID 19844–45.) That interpretation flowed from an application of inapposite, commercial-insurance precedent, rather than from the language of the parties' agreement.

In the insurance context, courts distinguish the "duty to defend" from the "duty to indemnify," with the former turning on the allegations in a tort action and the latter on the "true facts" proven there. *See, e.g.*, *Travelers Indem. Co. of Am. v. Moore & Assocs. Inc.*, 216 S.W.3d 302, 305 (Tenn. 2007). But those cases turn on insurance contracts with particular terms imposing particular obligations and reflecting particular allocations of risk: their distinctions have always been of text, not Platonic forms. *See S. Knoxville Brick Co. v. Empire State Sur. Co.*, 150 S.W. 92,

93–94 (Tenn. 1912) (in oldest Tennessee case distinguishing two duties, rendering decision based on presence of terms expressly imposing each); *accord, e.g.*, *Park Corp. v. Great Am. Indem. Co.*, 213 S.W.2d 12, 13–14 (Tenn. 1948) (same; "[E]ach case must turn upon the particular contract.").

Here, the key term defining Continental's obligation to indemnify is "claims." The "true facts" Paragraph 8 implicates are thus what the *Cruz* plaintiffs claimed, and whether Nissan's damages and costs "ar[ose] from" that *claim* (rather than, e.g., a different claim). The District Court was thus not required—as it might have been interpreting an ISO form[18] insurance policy—to determine whether the *Cruz* plaintiffs' claims were true, only whether Nissan incurred damages and costs as a result of those claims.

The District Court erred when it invoked the true-facts principle relying exclusively on cases applying insurance contracts whose indemnification clauses required causation in fact. *See Acuity v. Reed Assocs. of TN*

---

[18] Insurance cases follow each other because insurance policies follow standard formats and even standard forms. *See Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 772 (1993) ("[Insurance Services Office Inc.] develops standard policy forms and files …; most CGL insurance … is written on these forms.").

*LLC*, 124 F. Supp. 3d 787, 792 (W.D. Tenn. 2015) ("Coverage A provides that 'insurance applies to *bodily injury* and *property damage* only if … caused by an occurrence'" (emphasis retained).); *CSX Transp. Inc. v. General Mills Inc.*, 2015 WL 468682, at *1 (N.D. Ga. Feb. 3, 2015), *rev'd* 846 F.3d 1333 (11th Cir. 2017) ("[Defendant] assumes all risk of loss … in connection with any personal injury … growing out of, [sic] the operation of [Defendant's] trackmobile.");[19] *St. Paul Fire & Marine Ins. Co. v. Torpoco*, 879 S.W.2d 831, 833 (Tenn. 1994) ("[P]rofessional liability protection covers you for damages resulting from: (1) Your … services." (line breaks omitted).).

Paragraph 8 requires causation, to be sure. The "damages and cost" must "aris[e] from" the injurious-defect claim. (PO Template, RE 24-2, PID 531.) The phrase "arising from" sweeps broadly, *see Reeser v. Yellow Freight Sys. Inc.*, 938 S.W.2d 690, 692 (Tenn. 1997) ("The phrase 'arising out of' refers to … a rational, causal connection."), but it is not infinite. Some case might entail damages or cost not "arising from" a relevant claim. But here, the record shows the damages and cost do.

---

[19] The District Court cited an opinion following remand that did not quote the contract. *See CSX Transp. Inc. v. General Mills Inc.*, No. 2018 WL 3458557 (N.D. Ga. July 18, 2018). (Memo., RE 223, PID 19849.)

### 2.5. Nissan incurred damages and cost arising from claims of personal injury caused by defective parts supplied by Continental, or at least a jury could so find.

The *Cruz* record confirms Nissan incurred damages and costs arising from a claim that Continental-supplied parts were defective and caused injury. Nissan thus should have obtained summary judgment. But even if some factual question prevented summary judgment for Nissan, the District Court erred in granting it to Continental.

#### 2.5.1. *The record confirms that Nissan incurred damages and costs from the* Cruz *plaintiffs' claim that Continental's parts were defective.*

Under the parties' agreement, the proper inquiry is whether the evidence and record from *Cruz* show that Nissan incurred damages and cost because the *Cruz* plaintiffs claimed Continental parts were injuriously defective. The record below, even construed in Continental's favor, shows Nissan was entitled to summary judgment.

Because Paragraph 8 requires Continental to indemnify Nissan for expenses arising from *claimed* defects in Continental parts, Nissan need not show that what the *Cruz* plaintiffs' claimed was true. What matters is only what took place in *Cruz*—the fact of the proceedings, not their preclusive effect. *See Rafeiro v. Am. Employers' Ins. Co.*, 5 Cal. App. 3d

799, 805 (1970) ("The issue … is not whether the apartments in fact suffered any diminution in value …, but whether the judgment, upon which plaintiff seeks to recover, represents damages [covered by the indemnity agreement]."); *see also Assurance Co. of Am. v. Continental Dev. & Constr. Inc.*, No. 3:08-cv-0711, at *3–4 (M.D. Tenn. June 8, 2009), *aff'd* 392 F. App'x 472 (6th Cir. 2010) (distinguishing fact of proceeding from findings made there).

The *Cruz* record reflects that (1) the plaintiffs alleged Continental's defective parts caused the accident; (2) Nissan incurred costs defending that claim; and (3) the jury awarded the *Cruz* plaintiffs damages on that claim. *See* Part 3.1, *infra*. The California trial and appellate courts then confirmed the verdict, both holding that the jury's verdict rested on a defect finding concerning Continental's parts, one for which Continental would have been, but for its settlement, jointly and severally liable. *See* Part 3.2, *infra*.

Thus even if the verdict were ambiguous (and read with the record it isn't), the *judgment* is not. The judgment entered only because the trial and appellate courts accepted a particular view of the evidence, one holding Continental's parts responsible. *See Barrese v. Murray*, 198 Cal. App.

4th 494, 503 (2011) (describing extensive thirteenth-juror powers of trial judges). Those rulings cure any conceivable uncertainty about the cause of Nissan's damages and costs: Nissan had to pay the *judgment*, not the unconfirmed *verdict*.

Nissan undeniably incurred damages and cost arising from the *Cruz* plaintiffs' claims to have been injured by defective Continental parts. Nissan was therefore entitled to summary judgment (at least) on liability.

### 2.5.2. *Even if the District Court could have denied Nissan's summary judgment motion, it erred in granting Continental's.*

Construing the facts in Nissan's favor, as required on Continental's cross-motion, *Shelton v. Rutherford Cnty.*, 780 F. Supp. 2d 653, 656 (M.D. Tenn. 2011), a jury could find at least some of Nissan's damages and costs from *Cruz* to have "aris[en] from claims of personal injury … caused directly or indirectly by parts supplied by" Continental.  Nissan and Continental defended the *Cruz* claim together until the morning of trial: so Continental can hardly contend Nissan incurred *no* pertinent damages or costs. If any jury could find—as the California trial and appellate courts did—that Nissan incurred any damages or costs arising from the *Cruz* plaintiffs' claims of injury from defective Continental parts, then

summary judgment for Continental was improper. *See Richko v. Wayne Cnty.*, 819 F.3d 907, 914 (6th Cir. 2016).

### 3. Even under the District Court's construction of Paragraph 8, Nissan is entitled to summary judgment, and Continental is not.

The District Court construed Paragraph 8 as requiring Continental to reimburse Nissan only upon a finding that an actual Continental defect had actually caused a third party's injury. Even accepting this interpretation, the District Court should have granted summary judgment to Nissan, not Continental. The *Cruz* plaintiffs pleaded, pursued, and presented their case to the jury on the theory that defective brake components supplied by Continental had caused the accident. No other supplier and no other components were at issue. In post-trial motions and on appeal, the California courts confirmed that the verdict rested on defect findings about Continental's parts, and they allowed Nissan to setoff Continental's settlement payment against the judgment—something only possible under California law if the jury had found Continental's parts defective. Continental cannot dispute those rulings here.

Thus even if the proper question were, as the District Court believed, whether the California judgment conclusively establishes that

Continental's parts were defective, the answer is "yes." No reasonable factfinder could conclude otherwise, entitling Nissan to summary judgment. At the very least, a factfinder *could* agree with Nissan, as the California courts did, precluding summary judgment for Continental.

### 3.1. The *Cruz* plaintiffs consistently and necessarily alleged a defect in Continental's parts.

The *Cruz* plaintiffs tried their case on the theory that Continental supplied Nissan with an ECU containing defectively designed software. From the complaint to the Court of Appeal, they blamed the crash on Continental's parts.

*Cruz* was a California products-liability case. (*Cruz* Final Rulings, RE 55-3, PID 929.) California imposes strict liability for injuries caused by defective products: for relevant purposes, the risks posed by a product's design must outweigh its benefits, *Soule v. Gen. Motors Corp.*, 882 P.2d 298, 305 (Cal. 1994), and the product must be a but-for, non-"infinitesimal," but not necessarily exclusive, cause of the injury, *see id.* at 311–12; *Rutherford v. Owens-Ill. Inc.*, 941 P.2d 1203, 1214 (Cal. 1997). Such liability applies to a product's manufacturers, distributors, and retailers, *Soule*, 882 P.2d at 303, even if the defect is confined to an incorporated component, *see Vandermark*, 391 P.2d at 170. And if the defect is in such

a component (but not otherwise), the component supplier is strictly liable too. *O'Neil v. Crane Co.*, 266 P.3d 987, 991 (Cal. 2012). For any given defective product and injury, all defendants are jointly and severally liable. *See Wimberly v. Derby Cycle Corp.*, 56 Cal. App. 4th 618, 628 (1997).

### 3.1.1. *Every stage of* Cruz *entailed an attack on Continental's parts.*

From beginning to end, the *Cruz* plaintiffs consistently maintained that the collision had resulted from defects in Continental's DSS and its accompanying software.

The *Cruz* plaintiffs sued Nissan and Continental, alleging their joint and several liability and explicitly blaming Continental's parts: "CONTINENTAL was the designer, manufacturer, … and seller of the defective component parts." (*Cruz* Compl. ¶ 15, RE 43-4, PID 780.) They alleged the vehicle posed a "safety threat" because Continental's DSS was "defective and faulty." (*Id.* ¶ 17.) Later paragraphs detailed allegations about the DSS, its interface with the ECU, and Continental's role designing both. (*Id.* at PID 781–85, 789.)

By the summary-judgment stage, the plaintiffs had honed their focus on Continental's ECU software. (*Cruz* R., RE 209-6, PID 12319, 12321–24.) Their trial brief identified Continental as the source "of the

defective braking components" and blamed defects in the ECU software for the accident. (*Cruz* Trial Br., RE 208-3, PID 8638–40, 8648–49.) By the motions in limine, Continental and the court were emphasizing that the plaintiffs' theory relied on defects in Continental's software and sensor. (*Cruz* R., RE 209-10, PID 12580–81, 12586, 12595–96; *see also* PID 12587 (Court: "Maybe for [Continental] the product is the [DSS] and its whole complicated system. Because that's the one they say allegedly failed.").)

At trial, the plaintiffs tried their case on the theory that Continental's parts had caused the collision. In opening, despite having settled with them the day before, they singled Continental out as the designer and proponent of OHB and the hardware and software that made it work. (*Cruz* R., RE 209-20, PID 13369–70.) They explained the car's key problem as "a software bug." (*Id.* at PID 13374–75.) The "bug" was the software's calibration that made it prone to generating false C1179 codes. (*Id.*)

The bug was the centerpiece of the plaintiffs' primary expert-witness testimony: the expert talked at length about the DSS and its software, opining that the ECU software activated OHB in Mr. Mathenge's QX56

through the confluence of its calibration bug (causing the C1179) and its activation settings (turning on OHB upon the C1179). (*Cruz* R., RE 209-25, PID 13733, 13737–42, 13746, 13747–48.) The plaintiffs closed by describing the vehicle's problem as "a defective software design" fixable by "simple reprogramming." (*Cruz* R., RE 209-43, PID 15393.) They blamed a false C1179 for causing Mr. Mathenge to hit the minivan. (*Cruz* R., RE 209-41, PID 15294–95; *Cruz* R., RE 209-43, PID 15387, 15393; *Cruz* R., RE 209-44, PID 15477–78, 15482–83, 15485.) The jury agreed, awarding more than $24 million in damages based on a finding that the brake system was defective and had caused the crash. (*Cruz* Verdict Form, RE 55-2, PID 920, 922–24.)

### 3.1.2.  *The* Cruz *plaintiffs blamed no other parts.*

The Cruz plaintiffs attacked Continental's parts not only early and often, but exclusively. Continental has identified no place in the *Cruz* record where the plaintiffs blamed the accident on any other brake-system component. And for good reason: the *Cruz* plaintiffs never did it.

The 3,691-page appellate transcript contains thirteen references to rotors, but only two in the plaintiffs' case, one concerning a physical inspection and one noting the QX56's brakes were mechanically functioned

operational. (*Cruz* R., RE 209-26, PID 13843; *Cruz* R., RE 209-30, PID 14130.) The other eleven references are equally mundane. *See* App'x A, *infra*. No one blamed the pads or calipers. *See id.* Bosch, the caliper supplier,[20] only appeared in a witness's employment history (*Cruz* R., RE 209-38, PID 14975), and the rotor supplier[21] went unnamed. *See* App'x A. Indeed, the plaintiffs' key expert admitted he lacked expertise in the brake system's friction components. (*Cruz* R., 209-25, PID 13772–73.) Nor has Continental suggested that any of the transcript's 848 instances of "pedal" entailed a suggestion the pedal was itself defective or that its feel made non-Continental parts defective. In short, the only evidence of alleged defects in the QX56's braking system related to parts Continental supplied.

### 3.2. The California courts confirmed that the *Cruz* judgment rested on defects in Continental's software.

The *Cruz* plaintiffs continued their focus on Continental's ECU software after the verdict. They withstood Nissan's post-trial motions and subsequent appeal by arguing that design defects in the ECU's

---

[20] *See* Robson Dep., RE 208-7, PID 9003.
[21] *See* Weidenbach Dep., RE 211-30, 110.

programming activated OHB, causing Mr. Mathenge to panic and crash. The California trial and appellate courts both concluded the *Cruz* plaintiffs had proven a defect in Continental-supplied parts.

### 3.2.1. *The trial judge confirmed and offset the verdict, holding the plaintiffs had proven a software defect caused the accident.*

In the wake of the verdict, the California trial judge found, in two separate rulings, that the plaintiffs had shown their injuries resulted from defects in Continental's components.

First, the court denied Nissan's motions for a new trial or judgment n.o.v., which argued a lack of causation evidence. (*Cruz* R., RE 209-46, PID 15555–57, 15571.) In doing so, it relied on the same key plaintiffs' expert: "He said … they didn't take into … consideration that midline would move …. So the thing would drift and then do a false positive that was the [software] error." (*Cruz* R., RE 209-46, PID 15574.) The judge held the plaintiffs had "prove[n] a design defect … beyond a reasonable doubt" and that "substantial evidence" established that this defect

"cause[d] the [driver] … to … go into a panic mode."[22] (*Id.*; *see* Final Rulings, RE 55-3, PID 927 (incorporating bench comments).)

Second, the trial court granted Nissan's alternative request to offset the verdict by Continental's settlement payment. California law gives a defendant credit on a judgment for settlement payments made by a co-defendant, provided the two caused a single injury. Cal. Civ. Proc. Code § 877; *In re JTS Corp.*, 617 F.3d 1102, 1116 (9th Cir. 2010). But a different California statute limits the credit's availability in comparative-fault cases. *See Espinoza v. Machonga*, 9 Cal. App. 4th 268, 272–77 (1992) (describing relation to Cal. Civ. Code § 1431.2). The statutes' net effect yields a credit in a products-liability case if, but only if, the settling and nonsettling defendants were jointly and severally liable. *See Bostick v. Flex Equip. Co.*, 147 Cal. App. 4th 80, 93–96 (2007). And for a component supplier like Continental to be jointly and severally liable, its component has to have been the injuriously defective part of the final product. *See O'Neil*, 266 P.3d at 996; *Lee v. Butcher Boy*, 169 Cal. App. 3d 375, 384 (1985).

---

[22] The judge later noted the expert's criticism of the software's activation strategy, but he did not identify it as the key causation evidence; regardless, both the activation-strategy and the interpretation-error aspects of Continental's software were prerequisites for the plaintiff's theory. (*See Cruz* R., RE 209-46, PID 15577–78; *Cruz* R., RE 209-25, 1348.)

In *Cruz*, then, Nissan could get credit for Continental's settlement payment if, but only if, it had been held liable for a defect in Continental's parts. And (again because of the statutory interplay) the credit would apply to the whole judgment if, but only if, all the plaintiffs' damages had been awarded on the strict-liability claim (instead of on the failure-to-recall claim). Consistently with its other rulings, the trial court held the entire award attributable to the strict-liability claim and offset the full settlement amount. (Final Rulings, RE 55-3, PID 928–30.)

### 3.2.2. *The Court of Appeal affirmed, holding the software's benefits did not outweigh its risks.*

The California appellate court affirmed both of the *Cruz* trial court's rulings, agreeing that the jury found that defective Continental-supplied parts caused the crash.

The Court of Appeal framed its defect analysis around the DSS and the bug affecting the software's interpretation of its signals: "[The DSS was] calibrated to measure from a [factory-set] starting value," but could "'drift' over time … to measure … from the wrong point," causing "a false C1179 code." (*Cruz* Op., RE 55-6, PID 946.) That problem would continue, the court noted, "until the sensor was replaced or the calibrating software was reprogrammed." (*Id.*; *see also id.* at PID 955 (evaluating risks of false

C1179 codes and benefits of original calibration).) The court's discussion of the software followed basic precepts of California products-liability law. *See Barker v. Lull Eng'g Co.*, 573 P.2d 443, 454 (Cal. 1978) (defining design-defect as circumstances where "the risk of danger inherent in the challenged design outweighs the benefits of such design").

And because Continental had supplied the components found defective, the offset ruling followed as a matter of course: "[b]ecause Continental and Nissan were jointly and severally liable for the product liability claim, the trial court … [properly] credit[ed] the settlement amount against the total damage award." (*Cruz* Op., RE 55-6, PID 962.)

### 3.3.  The California courts' rulings bind Continental.

The District Court correctly held that, under its interpretation of the indemnification clause, preclusion should apply, but it erred in applying the doctrine to the *Cruz* record. Under Tennessee law an indemnitor given notice and an opportunity to defend its indemnitee is bound by the resulting judgment, even if it declines to participate. *Pyle v. Bituminous Cas. Corp.*, 299 S.W.2d 665, 669–71 (Tenn. Ct. App. 1956). The judgment's effect vis-à-vis the indemnitor is the same as against any other party bound by issue preclusion. *See Clark v. Sputniks LLC*, 368 S.W.3d

431, 435 (Tenn. 2012) (citing collateral-estoppel cases in indemnification context).

Nissan tendered defense of *Cruz* to Continental. (Answer ¶ 40, RE 45, PID 843; Resp. to Stmt. of Facts ¶ 6, RE 64, PID 2994; Tender Ltr., RE 43-6, PID 826.) Continental refused the tender, but participated on its own behalf until the morning of voir dire. Even then, it could have intervened to protect its interest, as potential indemnitor, in the form of the judgment. *See* Cal. Civ. Proc. Code § 387; *Executive Risk Indem. Inc. v. Jones*, 171 Cal. App. 4th 319, 333 n.11 (2009). So there is no fairness lacking in applying the *Cruz* judgment to Continental, assuming doing so were necessary.

**3.4. The District Court misconstrued the preclusive effect of *Cruz* and erred in granting Continental summary judgment.**

Properly considering the complete *Cruz* record, as required, Nissan is entitled to summary judgment or, at the very least, a trial.

California law governs *Cruz*'s preclusive effect. *Matsushita*, 516 U.S. at 373. In California, one determines a judgment's preclusive scope and effect "by look[ing] carefully at the [proceeding's] entire record." *Hernandez v. City of Pomona*, 207 P.3d 506, 514 (Cal. 2009). Preclusion extends

to findings "'sufficiently firm' to be given preclusive effect,"[23] rather than merely to the contents of a single final order. *See Border Bus. Park Inc. v. City of San Diego*, 142 Cal. App. 4th 1538, 1564 (2006). That includes an appellate court's rulings. *See, e.g.*, *City of Arcadia v. State Water Res. Control Bd.*, 191 Cal. App. 4th 156, 174 (2010). And California treats as binding decisions, of fact and law, *see Eilrich v. Remas*, 839 F.2d 630, 634 n.2 (9th Cir. 1988), that were not "'entirely unnecessary' to the judgment." *Lucido v. Superior Ct.*, 795 P.2d 1223, 1226 (Cal. 1990). Thus, findings supporting a prior decision carry preclusive effect, even if "they do not themselves resolve an element of [a] claim." *Key v. Tyler*, 34 Cal. App. 5th 505, 536 (2019).

*Cruz*, then, tells us everything the District Court held it needed to know. The post-trial and appellate rulings expressly held Continental's components (1) defective and (2) at fault for the crash. *See* Part 3.2, *supra*.

---

[23] Sufficient firmness is based on a factoring test considering "(1) whether the decision was not avowedly tentative; (2) whether the parties were fully heard; (3) whether … a reasoned opinion [issued]; and (4) whether the decision was [appealable]." *Border Business Park*, 142 Cal. App. 4th at 1565. The post-trial rulings check all four. *See Saxena v. Goffney*, 159 Cal. App. 4th 316, 324 (2008) ("An appeal may be taken from an order denying a motion for JNOV.").

That was all the preclusion the District Court needed to enter summary judgment for Nissan.

The District Court, though, only asked what the jury had found. (Memo., RE 223, PID 19849.) And while California issue preclusion is not so constrained, the District Court's speculation, that *maybe* the jury had found some non-Continental part defective, was unwarranted. It is simply not the case that the *Cruz* plaintiffs "alleged multiple interrelated features of the [QX56] … contributed to the" collision.[24] (Memo. Op., RE 223, PID 223.) *See* Part 3.1, *supra*. Neither the District Court nor Continental identified any non-Continental part at issue in *Cruz*.

The *Cruz* jury could only have rendered a verdict based on the evidence. *See, e.g.*, *Nishihama v. City & Cnty. of San Francisco*, 93 Cal. App. 4th 298, 305 (2001). The evidence there—indeed plaintiffs' entire theory—focused solely on Continental's parts. The activation strategy was no exception: Continental put the strategy in its software and would have been liable for it. *See Brocklesby v. United States*, 767 F.2d 1288, 1295 n.10 (9th Cir. 1985) ("California courts have rejected [the contract

---

[24] Continental claimed this (Resp. to Stmt. of Fact, RE 202, PID 8233 ¶ 8 (citing *Cruz* Compl., RE 43-4, PID 796–801)), but the record does not support it. *See* Part 3.1, *supra*.

specifications] defense."). So there is no ambiguity in or phantom defect underlying the *Cruz* judgment.

If there were an ambiguity the result should not have been judgment for Continental. Rather, the District Court should have employed extrinsic evidence—which points in Nissan's favor—to resolve the ambiguity. *See SLPR LLC v. San Diego Unified Port Dist.*, 49 Cal. App. 5th 284, 299–300, 314 (2020). And if that failed, the District Court should have sent the case to trial. *See id.* at 297; *Chateau De Louis LLC v. Everest Indem. Ins. Co.*, No. A130349, 2013 WL 3441354, at *3–4 (Cal. Ct. App. July 9, 2013). Unresolved ambiguities present questions of fact, *see SLPR*, 49 Cal. App. 5th at 292, which cannot be answered on summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

## 4. The District Court improperly entered summary judgment *sua sponte* on the *Cruz* defense costs.

The District Court acknowledged that the Terms and Conditions entitled Nissan to recover costs of defending claims that a Continental part was defective. (Memo., RE 223, PID 19850.) And Continental never moved for summary judgment on the basis that Nissan had failed to segregate its *Cruz* fees on this claim from its fees on other claims. But the District Court entered summary judgment on that basis anyway. Its

decision to grant an unsought summary judgment on this issue was an abuse of discretion, and its ruling an error of law. *See Bennett*, 410 F.3d at 816 (identifying dual standard).

### 4.1. The District Court abused its discretion by awarding summary judgment to Continental on Nissan's claims for defense costs on a basis not briefed and without notice.

Continental sought summary judgment concerning Nissan's *Cruz* litigation expenses on two grounds: that they lay outside the scope of Paragraph 8 and that they were unrecoverable as a result of Nissan's own negligence. (Cont. R.56 Memo., RE 191, PID 7759–63.) Nowhere did it argue that Nissan should be able to recover solely *Cruz* fees and expenses tied specifically to Continental's parts. But the District Court passed over Continental's arguments and entered summary judgment on Nissan's defense costs on its own allocation theory: "Nissan cannot recover the costs or fees associated with [*Cruz*]. Nissan must establish at least some basis for allocating any costs or fees specifically to a Continental defect, which it has not done." (Memo., RE 223, PID 19850.)

The District Court abused its discretion by granting judgment to Continental on this basis because Nissan lacked notice that its defense-

costs claim was being challenged for want of allocation and thus had no opportunity to respond. *See Bennett*, 410 F.3d at 816.

The District Court's *sua sponte* ruling was prejudicial for at least three reasons.

First, Paragraph 8 does not limit Nissan's recovery to expenses "specifically" allocable "to a Continental defect." Continental's defective parts were an essential element of the entire *Cruz* suit. (*Cruz* R., RE 209-41, PID 15305–09 (noting parties' and court's agreement that defect was prerequisite to recall claim).) So all of the litigation costs "aris[e] from" the defect claim, given the expansiveness of that terminology. *See Reeser*, 938 S.W.2d at 692 ("'[A]rising out of' refers to … a rational, causal connection."); *Am. Guar. & Liabl. Ins. Co. v. Norfolkf S. Ry.*, 278 F. Supp. 3d 1025, 1040 (E.D. Tenn. 2017) ("[A]rising out of' … appl[ies] to any incident … in some way related to the named [factor].").

Second, Tennessee law does not require segregation of litigation expenses where all claims were based on common facts and an allocation would be impractical. *See G.T. Issa Constr. LLC v. Blalock*, No. E2020-0853, 2021 WL 5496593, at *8 (Tenn. Ct. App. Nov. 23, 2021). The

allegations against Continental's parts were embedded in every part of *Cruz*, obviating the need for allocation of Nissan's defense costs.

Third, had it been given notice that allocation was expected, Nissan would have endeavored to undertake it. The detailed billing records filed with Messrs. Berry's and Boutrous's declarations provide ample raw material for an attempt. (*See* Berry Decl., RE 57, PID 969–72; Boutrous Decl., RE 58, PID 2752–53.) Had Nissan been notified that its claim for *Cruz* litigation costs was being challenged for failure to allocate, it would have introduced additional declarations. (*Cf.* Hamburger Dep., RE 208-23, PID 11154–241.)

Nissan never had the opportunity to present argument or evidence tailored to any of these facets of the issue. The District Court accordingly abused its discretion by resolving it *sua sponte*. *See Bennett*, 410 F.3d at 816–17.

### 4.2. The allocation question is one of the amount, not existence, of damages, for which summary judgment was inappropriate.

Even if, as the District Court held, allocation were required for Nissan to recover defense costs, a lack of allocation is not a basis for summary judgment for Continental. Mere uncertainty about the amount of

damages does not entitle a defendant to summary judgment. Instead, Continental could only have obtained summary judgment on Nissan's defense costs by showing the absence of a genuine dispute over the *existence* of those damages, not uncertainty about their *amount. Pfahler v. Nat'l Latex Prods. Co.*, 517 F.3d 816, 837 (6th Cir. 2007). Because all the District Court concluded—and the most its rationale, even if accepted, supports—is that the *amount* of Nissan's litigation-expense damages remained uncertain, it erred by entering summary judgment in Continental's favor on the recoverability of these damages. *See id.*

## CONCLUSION

For all these reasons, the District Court should be reversed, and judgment entered in favor of Plaintiff, or, in the alternative, the case remanded for further proceedings.

s/ Paul J. Krog
Eugene N. Bulso Jr.
Paul J. Krog
Bulso PLC
155 Franklin Road, Suite 400
Brentwood, Tennessee 37027
615-913-5200
615-913-5150
gbulso@bulso.com
pkrog@bulso.com
*Counsel for Plaintiff-Appellant, Nissan North America Inc.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains, according to the word count provided by the program in which it was typed, 12,841 words.

This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because it was prepared using Microsoft Office Word 365 and typed in roman-style fourteen-point Century Schoolbook font, a proportional typeface with serifs.

 s/ Paul J. Krog
Counsel for Appellee
September 9, 2022

## 6th CIRCUIT RULE 30(G) DESIGNATION
## OF RELEVANT DOCUMENTS

| District Court Docket Number | Description | Page ID Range |
|---|---|---|
| 1 | Notice of Removal | 1–6 |
| 1-1 | Complaint and Summons | 7–136 |
| 1-3 | Declaration of Carolyn Miller | 138–39 |
| 9 | Answer | 158–67 |
| 23-1 | Sourcing Documents | 365–426 |
| 23-3 | Class Action Complaint, *Banks v. Nissan North America Inc.*, No. 11-2022 PJH, 2012 WL 8969415 (N.D. Cal. Apr. 25, 2011) | 460–76 |
| 23-4 | Class Action Complaint, *West v. Nissan North America Inc.*, No. cv-2011-0273-3 (Ark. Cir. Ct. July 25, 2013) | 477–95 |
| 24 | Declaration of Mark Meltzer | 516–17 |
| 24-2 | Exhibit B – Purchase Order Template | 530–31 |
| 25 | Declaration of Dale Pinnekamp | 532–33 |
| 34 | Affidavit of Ratification by Sompo Japan Nipponkoa Insurance Inc. | 563–64 |
| 43 | Amended Complaint | 683–701 |
| 43-1 | Exhibit A – Commercial Commitment Document | 702–710 |
| 43-2 | Exhibit B – Purchase Orders & Terms and Conditions | 711–24 |

| 43-3 | Exhibit C – Master Purchase Agreement | 725–75 |
|------|----------------------------------------|--------|
| 43-4 | Exhibit D – Consolidated Complaint, *Cruz v. Mathenge*, No. BC 493949 (Cal. Super. Ct. Jan. 14, 2016) | 776–804 |
| 43-5 | Exhibit E – Solomon Mathenge Cross-Complaint | 805–25 |
| 43-6 | Exhibit F – Tender Letter from Nissan to Continental on May 7, 2015 | 826–27 |
| 45 | Answer to Amended Complaint | 834–47 |
| 52 | Stipulated Protective Order | 895–906 |
| 55 | Plaintiff's Motion for Summary Judgment | 910–12 |
| 55-2 | Exhibit 2 – *Cruz* Jury Verdict Form | 920–25 |
| 55-3 | Exhibit 3 – *Cruz* Final Rulings | 926–36 |
| 55-4 | Exhibit 4 – *Cruz* Satisfaction of Judgment – Cruz | 937–40 |
| 55-5 | Exhibit 5 – *Cruz* Satisfaction of Judgment – Mathenge | 941–44 |
| 55-6 | Exhibit 6 – Opinion, *Cruz v. Mathenge*, No. B286067, 2019 WL 926498 (Cal. App. Feb. 26, 2019) | 945–62 |
| 56 | Declaration of Janete Barnett | 963–64 |
| 57 | Declaration of Mark V. Barry | 968–72 |
| 58 | Declaration of Theodore J. Boutrous, Jr. | 2750–53 |
| 60 | Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment | 2925–42 |

| 63 | Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment | 2965–91 |
|---|---|---|
| 64 | Continental's Response to Nissan's Statement of the Facts | 2992–3009 |
| 64-11 | Exhibit 11 – *Cruz* Stipulations – Continental's Ex Parte Application Regarding Determination of Good Faith Settlement | 3055–82 |
| 67 | Defendants' Motion for Summary Judgment | 3130–32 |
| 68 | Defendants' Memorandum of Law in Support of Motion for Summary Judgment | 3133–53 |
| 77 | Plaintiff's Reply in Further Support of Motion for Summary Judgment | 3302–10 |
| 78-1 | Excerpt from Deposition of Andrew Smith (September 16, 2016) | 3322–23 |
| 80-1 | Excerpt from Deposition of Graham Russell, Volume 1 | *Sealed |
| 81 | Order Granting Motion to Seal | 3357 |
| 84 | Response to Defendant's Motion for Summary Judgment | 3362–88 |
| 84-6 | Exhibit 6 – Declaration of Paul Garner Jr. | 3472–74 |
| 84-7 | Exhibit 7 – Technical Service Bulletin | 3475–96 |
| 87-1 | OHB Presentation | *Sealed |
| 87-2 | Truck Platform Braking Proposal | *Sealed |
| 87-3 | Letter from Martin Schulenburg to Ichiro Watanabe on April 3, 2020 | *Sealed |

| 87-5 | ZW/WZW Platform Brake System Proposal | *Sealed |
|---|---|---|
| 87-6 | VDC Additional Functions Outline | *Sealed |
| 87-14 | Solicitation Letter from Martin Schulenberg to Shunichi Nabetani on November 7, 2001 | *Sealed |
| 87-18 | Declaration of Steve Sullivan | *Sealed |
| 94 | Order Granting Nissan's Second Motion to File Under Seal | 3784 |
| 96 | Defendants' Reply Memorandum in Support of Motion for Summary Judgment | 3786–92 |
| 97 | Continental's Response to Nissan's Statement of Additional Facts in Opposition to Defendants' Motion for Summary Judgment | 3793–3805 |
| 100 | Order Granting Continental's Motion to File Documents Under Seal | 3877 |
| 120 | Memorandum Opinion on Summary Judgment Motions | 6118–38 |
| 121 | Order on Motions for Summary Judgment | 6139 |
| 180-1 | Summary Review of Nissan Purchasing Terms and Conditions | 7568–69 |
| 180-3 | Beaver Deposition Exhibit 25 (Sourcing Documents) | 7581–86 |
| 180-4 | Beaver Deposition Exhibit 26 (Purchase Order) | 7587–98 |
| 180-5 | Beaver Deposition Exhibit 28 (Contemporaneous Purchase Orders) | 7599–7602 |
| 187 | Plaintiff's Second Motion for Summary Judgment | 7650–51 |

| 189 | Plaintiff's Memorandum in Support of Second Motion for Summary Judgment | 7701–14 |
|---|---|---|
| 190 | Defendant's Second Motion for Summary Judgment | 7733–35 |
| 191 | Defendant's Memorandum in Support of Second Motion for Summary Judgment | 7736–65 |
| 192-6 | Excerpt from Interview of Atsutoshi Takahashi (October 20, 2021) | 7829–51 |
| 201 | Defendant's Response in Opposition to Plaintiff's Second Motion for Summary Judgment | 8215–27 |
| 202 | Continental's Response to Nissan's Statement of Undisputed Facts and Continental's Statement of Additional Material Facts | 8228–40 |
| 206 | Plaintiff's Response in Opposition to Defendant's Second Motion for Summary Judgment | 8279–8305 |
| 208-3 | Trial Brief for *Cruz* Plaintiffs and Solomon Mathenge | 8637–55 |
| 208-4 | Second Declaration of Dale Pinnekamp | 8656–66 |
| 208-5 | Declaration of Adelita Ferrell | 8667–74 |
| 208-6 | Interview of Atsutoshi Takahashi (October 20, 2021) | 8675–8769 |
| 208-7 | Deposition of Paul Robson (December 3, 2020) | 8770–9069 |
| 208-8 | Interview of Yasuyuki Tominaga (September 30, 2021) | 9070–9177 |
| 208-9 | Deposition of Scott Warnecke (December 11, 2020) | 9178–9365 |

| 208-10 | Deposition of Mark Meltzer (July 23, 2021) | 9366–9528 |
| 208-11 | Deposition of Bill Kimmel (March 11, 2021) | 9529–79 |
| 208-12 | Deposition of Robert Weaver (March 11, 2021) | 9580–9649 |
| 208-13 | Deposition of Robert Weaver (January 19, 2021) | 9650–9890 |
| 208-14 | Deposition of Andrew Smith (September 23, 2021) | 9891–10081 |
| 208-16 | Deposition of Andrew Smith (February 5, 2021) | 10,171–10,448 |
| 208-17 | Deposition of Lewis Lawson (June 25, 2021) | 10,449–10,627 |
| 208-18 | Deposition of Keith Swan (June 24, 2021) | 10,628–10,797 |
| 208-23 | Deposition of Bradley J. Hamburger (November 11, 2021) | 11,154–11,246 |
| 208-25 | Deposition of Natarajan Thiagarajan Athreya (June 17, 2021) | 11,275–11,586 |
| 208-27 | Deposition of Scott Russell (February 17, 2021) | 11,784–11,939 |
| 209-4 | *Cruz* Appellate Record Volume 2, Part 1 | 12,162–12,239 |
| 209-6 | *Cruz* Appellate Record Volume 3 | 12,302–12,352 |
| 209-10 | *Cruz* Appellate Record Volume 5, Part 2 | 12,565–12,655 |
| 209-14 | *Cruz* Appellate Record Volume 7, Part 2 | 12,856–12,920 |

| 209-15 | *Cruz* Appellate Record Volume 8 | 12,921–13,035 |
| 209-20 | *Cruz* Appellate Record Volume 11, Part 2 | 13,365–13,429 |
| 209-25 | *Cruz* Appellate Record Volume 16, Part 1 | 13,699–13,790 |
| 209-26 | *Cruz* Appellate Record Volume 16, Part 2 | 13,791–13,882 |
| 209-30 | *Cruz* Appellate Record Volume 18, Part 2 | 14,121–14,219 |
| 209-32 | *Cruz* Appellate Record Volume 20 | 14,331–14,451 |
| 209-36 | *Cruz* Appellate Record Volume 22, Part 2 | 14,754–14,848 |
| 209-37 | *Cruz* Appellate Record Volume 23 | 14,849–14,934 |
| 209-38 | *Cruz* Appellate Record Volume 24, Part 1 | 14,935–15,026 |
| 209-41 | *Cruz* Appellate Record Volume 25, Part 2 | 15,218–15,316 |
| 209-42 | *Cruz* Appellate Record Volume 26, Part 1 | 15,317–15,377 |
| 209-43 | *Cruz* Appellate Record Volume 26, Part 2 | 15,378–15,438 |
| 209-44 | *Cruz* Appellate Record Volume 27 | 15,439–15,493 |
| 209-45 | *Cruz* Appellate Record Volume 28, Part 1 | 15,494–15,563 |
| 209-46 | *Cruz* Appellate Record Volume 28, Part 2 | 15,564–15,634 |
| 211-1 | Deposition of Robert Yakushi (July 22, 2021) | *Sealed |

| 211-10 | Deposition of Robert Beaver (March 11, 2021) | *Sealed |
| 211-12 | Deposition of Robert Beaver (January 19, 2021) | *Sealed |
| 211-14 | Deposition of Andrew Smith (February 5, 2021) | *Sealed |
| 211-16 | Deposition of Lewis Lawson (June 25, 2021) | *Sealed |
| 211-18 | Deposition of Mark Berry (September 8, 2021) | *Sealed |
| 211-30 | Deposition of Jeff Weidenbach (May 21, 2021) | *Sealed |
| 211-35 | Deposition of Graham Scott Russell (April 6, 2017) | *Sealed |
| 214 | Order Granting Motion for Leave to File Under Seal | 19674 |
| 215 | Defendant's Reply Memorandum in Support of Second Motion for Summary Judgment | 19,675–81 |
| 217-2 | ICAR Resolution | *Sealed |
| 219 | Plaintiff's Reply in Further Support of Second Motion for Summary Judgment | 19,738–44 |
| 223 | Memorandum Opinion on Second Motions for Summary Judgment | 19,830–51 |
| 224 | Order Denying Plaintiff's Second Motion for Summary Judgment and Granting Defendant's Second Motion for Summary Judgment | 19,852 |
| 225 | Entry of Judgment | 19,853 |
| 226 | Notice of Appeal | 19,854–55 |

# FEDERAL RULE OF APPELLATE PROCEDURE 28(f) COMPENDIUM

## Federal Rule of Civil Procedure 56. Summary Judgment.

**(a)** MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT. A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

**(b)** TIME TO FILE A MOTION. Unless a different time is set by local rule or the court orders otherwise, a party file a motion for summary judgment at any time until 30 days after the close of all discovery.

**(c)** PROCEDURES.

    **(1)** ***Supporting Factual Positions.*** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

        (A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

        (B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

    **(2)** ***Objection That a Fact Is Not Supported by Admissible Evidence.*** A party may not object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

**(3)** *Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

**(4)** *Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

**(d)** WHEN FACTS ARE UNAVAILABLE TO THE NONMOVANT. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1)    defer considering the motion or deny it;

(2)    allow time to obtain affidavits or declarations or to take discovery; or

(3)    issue any other appropriate order.

**(e)** FAILING TO PROPERLY SUPPORT OR ADDRESS A FACT. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1)    give an opportunity to properly support or address the fact;

(2)    consider the fact undisputed for purposes of the motion;

(3)    grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or

(4)    issue any other appropriate order.

**(f)** JUDGMENT INDEPENDENT OF THE MOTION. After giving notice and a reasonable time to respond, the court may:

(1)    grant summary judgment for a nonmovant;

(2)    grant the motion on the grounds not raised by a party; or

(3)        consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

**(g)** FAILING TO GRANT ALL THE REQUESTED RELIEF. If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case.

**(h)** AFFIDAVIT OR DECLARATION SUBMITTED IN BAD FAITH. If satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay, the court—after notice and a reasonable time to respond—may order the submitting party to pay the other party the reasonable expenses, including attorney's fees, it incurred as a result. An offending party or attorney may also be held in contempt or subject to other appropriate sanctions.

# APPENDIX A

## References to Other Brake Parts in *Cruz* Record

| | | | | |
|---|---|---|---|---|
| **"Rotor(s)," "Brake Line(s)," "Pad(s)," and "Caliper(s)"** | | | | |
| **DE** | **PID** | **Speaker** | **Purpose** | **Discussion** |
| 209-7 | 12390 | Court | Clarification on general brake question (Pretrial) | I'm gathering from what you're saying that it's not a complete failure of the braking system, like someone just cut the ***brake line*** and there is no brake, that it's just no longer what a reasonable consumer would expect. |
| 209-10 | 12575 | Mr. Latiolait, Continental's counsel | General background (Pretrial) | MR. LATIOLAIT: So it's a mechanical system, and it's a hydraulic system. You step on the brake. Step on the lever. The lever pushes a plunger. The plunger pushes hydraulic fluid down to something called ***calipers***. They pinch something called the ***rotor***, and they slow the wheel. |
| 209-10 | 12577–78 | Mr. Latiolait, Continental's counsel | General background (Pretrial) | MR. LATIOLAIT: So next I'm going to show you how the other part of the system works. So this relates to the ***calipers*** and the ***rotors*** and is self-explanatory. THE COURT: By the way, is this similar to the type of model of this particular car? MR. LATIOLAIT: This is generic, but all of these parts apply to this car. So that's the ***rotor***. The wheel attaches to that and rotates. Braking is done by a ***caliper***. So like hand brakes on a bicycle, it pinches the wheel and slows it down. And this is operated by hydraulic fluid, which comes in through this line, and you'll see in a second how this works…. MR. LATIOLAIT: Okay. So that's the ***caliper*** pinch, the ***rotor***… |

| 209-20 | 13383 | Mr. Turnbull, Plaintiff's counsel | Factual Background (opening statement) | And in the next couple weeks -- Mr. Arndt is his name -- inspected the vehicle for two days. Checks the **brake lines**, the **brake pads**, the **calipers**, the **rotors**, bled them, did everything he needed to do in order to do a full report. At the conclusion of his report, he writes mechanically this vehicle contained no defects. |
|--------|-------|-----------------------------------|----------------------------------------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 209-20 | 13413–16 | Mr. Turnbull, Plaintiff's counsel | Identify photograph, factual background (opening statement) | Here's a simple illustration. You put your foot on the brake pedal. It pushes a plunger that gathers brake fluid from the master cylinder and pushes this out into the brake **calipers**, which close on a disk. ….<br>You cannot compress fluid. So if you push the brake, push the plunger through the master cylinder, the fluid is going to move away from where the plunger is pushing it, and it moves towards the brakes, and it causes the **calipers** to close on the disk.<br>These are photographs taken by LAPD of the right front. … So here we see a brake **rotor**, or part of it, the disk, and you can kind of see in this photograph and now we're looking straight on, here are the lug nuts that the wheel and tire go onto to attach it, and there's the caliper, and on the inside of the **caliper** is the **brake pads** that close on the **rotor**.<br>So here your **pads** are worn. That's what they are talking about. **Caliper** closing. The **pads** are wearing because they rub against this **rotor**. It creates heat and the friction wears them down, and eventually you have to replace the **pads**, and you have other debris or things that may cause the **rotor** to be less |

| | | | | smooth, then you may need to replace the **rotor**.<br><br>…<br><br>The **rotors** and **pads** were in good condition on Mr. Methenge's vehicle. Okay? The basic brake system depends on fluid. What about the fluid? Adequate brake fluid. The brakes stopped the wheels.<br><br>Now, I'm going to talk about newer technologies that improve braking, but even if all of those failed, and they didn't, you still have the foundation brake system. You still have fluid, and if you push the fluid, it's going to cause the **calipers** to close on the **rotor** and close the vehicle down. So the brakes were working.<br><br>…<br><br>LAPD checked the brake booster on this vehicle. The **rotors** and rads were in good condition. There was adequate brake fluid, the power booster worked. |
|---|---|---|---|---|
| 209-25 | 13763 | Dr. Kanellakopoulos, Plaintiff's expert | Background on brakes at issue | Q. Have you looked at any evidence in the case that suggests that damage from the crash would have resulted in the active codes which are, indeed, in the active display?<br>A. Yes.<br><br>…<br><br>But the codes that were in the active area were certainly consistent with **brake lines** having been broken, modules missing. |
| 209-26 | 13843 | Dr. Kanellakopoulos, Plaintiff's expert | Background on brakes at issue | Q. Did you consider his inspection, where he says that the brake booster was in good condition?<br>A. What I remember from both Mr. Beaver's deposition and also from the LAPD inspection, they found that the parts of the brakes, the **rotors**, the **pads**, |

| | | | | the discs, with the exception of the fluid lines that were going to the front right of the vehicle, were in good condition. |
|---|---|---|---|---|
| 209-30 | 14130 | Mr. Mathenge | Background on brakes at issue | Q. All right. Now I am going to take you to the next document which is 377-2, and have you pull up the middle section. Down a little lower. This would show – it says (as read): Boxes checked below identify satisfactory condition or adjustments of requirement equipment. This refers to the brakes on the left-hand side; right? It shows service brake, parking brake, lining and shoes, drums and *rotors* – all those are checked; right? A. Yes. |
| 209-36 | 14826 | Mr. Leaphart, Nissan's expert | Background on brakes (general) | Q. So this unit here is where the pipes come out, in and out, where brake fluid is pumped to pulsate the brakes? A. Correct. So right now we have these bolts and these threaded holes here. But these bolts are what the brake pipes would thread into when it's mounted in the vehicle. And as a result, the brake pipes contain the brake fluid, and the brake fluid helps apply pressure to the *rotors* and *calipers* to help stop the car. |
| 209-37 | 14891–92 | Mr. Leaphart, Nissan's expert | Background on brakes (general) | Q. All right. You also talked about pipes that are connected – A. Yes. Q. – to these two devices? Right? A. Yes. Q. And that are also connected down to the wheel *calipers*? A. Yes. |

| 209-38 | 14985 | Mr. Walker, Nissan's expert | Discussing content of his book | The book is designed and focused on teaching – not so much engineers, but people who are automotive interested or automotive enthusiasts, technically-minded people, how the entire brake system works, all the way from the brake pedal, where you push, all the way to the tires, where the car stops. And how you would consider designing each part, like a master cylinder, or how you would select a **brake pad**, or why the **rotor** looks the way it does. |
| --- | --- | --- | --- | --- |
| 209-38 | 14993 | Mr. Walker, Nissan's expert | Background on brakes (general) | What the diagram shows us is, just like the vehicle in question here, we have a four-wheel disc brake system…. <br><br> The yellow thing we call the **caliper**. It squeezes the silver thing, which is called a **rotor**. It spins with the wheel. When the **caliper** squeezes on the **rotor**, it slows the thing down, slows the tire down. <br><br> Up here in the middle of the image, we have what is called the apply system. What causes the pressure which allows the **caliper** to squeeze. |
| 209-38 | 14996 | Mr. Walker, Nissan's expert | General description of brakes in question | So the master cylinder's job is very simple: convert the force from the booster into pressure so the pressure can go to the **calipers** to squeeze on the spinning things. And it is so complex in design because of all the fail safes, redundancies, and backup modes we have baked into it mechanically. |
| 209-38 | 15000 | Mr. Walker, Nissan's expert | Background on brakes (general) | There is a part on the **caliper** called a bleeder valve. When you bleed your brakes, you would |

| | | | | |
|---|---|---|---|---|
| | | | | open this valve up. It is normally closed…. |
| 209-38 | 15002–03 | Mr. Walker, Nissan's expert | Describing brake system schematic | But we would put this device in between the master cylinder and the *calipers*. So this *brake line* here and this *brake line* here, we splice into it. We put those *brake lines* into the modulator. Then the lines come out of the modulator to go to the four wheels and tires at the four corners of the vehicle. … There are two things – or three, really. Three things this modulator can do. The first is, it can increase the brake pressure in the *brake lines* to a higher level than you did with your foot. So if you brake a little bit, it can brake a lot. In some cases, we call that stability control or traction control. … And those two pumps pump the fluid from the master cylinder to the wheels to the *calipers* to allow them to squeeze higher than if the driver had just hit the brake pedal on his or her own. |
| 209-38 | 15007 | Mr. Walker, Nissan's expert | Describing evaluation of brake pad | This report was written in response to a change to the *brake pad*. But they don't test just the *brake pad* at Nissan; they test all of the brake system attributes when the *pad* is changed. So this table here, for example, is looking at the stopping performance of the vehicle under a variety of conditions, including OHB, when they do a *brake pad* change or when they are considering a *brake pad* |

| | | | | change for the production vehicles. |
|---|---|---|---|---|
| 209-39 | 15033 | Mr. Walker, Nissan's expert | Describing test instrumentation | Q. And next 2771-45. What is this?<br>A. This is the centralized hub where all of the data comes together. It's called the data acquisition system. We're measuring not just how hard I'm hitting the brake pedal and not just how the vehicle moves. But also, say, the pressure in all the **brake lines**. We're measuring the speed of the vehicle using GPS technology. We're measuring how far the brake pedal moves with another transducer. |
| 209-39 | 15036 | Mr. Walker, Nissan's expert | Describing test of brake performance | For this particular test we were measuring at six different locations. Excuse me, four different locations. Each of the **calipers** we fitted with a transducer to measure how much pressure there, how much squeezing power there was at each **caliper**. We were also measuring the temperature of the **brake pads**, the front **brake pads**. |
| 209-39 | 15054–56 | Mr. Walker, Nissan's expert | Describing photograph of the brakes | THE WITNESS: So here this is the brake pedal looking from the floor of the vehicle up. This is the pedal **pad** where you push. This is the brake pedal arm we discussed earlier. …<br>Q . BY MR. BERRY: All right. Next, 2758-67.<br>A. The next component was the brake booster.<br>… The DSS connector, which is sort of hidden here behind these **brake lines**, but it's there.…<br>Q. And the next, 2758-97.<br>A. This is now looking at just one example of the brake corner or the **calipers** and **rotors** and **pads**. This is the left front **caliper** and **rotor**. We found there were no leaks. The hose was |

| | | | | |
|---|---|---|---|---|
| | | | | connected. The ***brake pads*** were in a proper state of wear. The ***rotor*** was plenty thick for operation. So no trouble found at the wheel ends, as we call it.<br>…<br>Q. Next, 2758-108?<br>A. This is a device we use to measure the thickness of the ***brake pads*** to see if they're worn out. We actually took them out and looked at them separately as well. But the ***brake pads*** themselves were intact. They were just fine. |
| 209-43 | 15394 | Mr. Kiesel, Plaintiff's counsel | Restating factual background (closing argument) | But let's look at Exhibit No. 377-2.… And this is the bureau of automotive repair certification that the brakes have been serviced. The brakes are working. The lining and shoes are good. The drums and ***rotors*** are good. The warning device system is good. The emergency stopping system is good. |
| 209-44 | 15460 | Mr. Klein, Nissan's counsel | Discussing brakes generally (closing argument) | Even the testimony from Mr. Walker. And there's no dispute about it. Even with no vacuum and no electronics. Let's take the OHB, disconnect it. Let's remove the brake booster, because Mr. Walker did this, you still have hydraulic fluid when you push the brake pedal that gets pushed to the ***calipers*** that tighten on the ***rotors*** and slow the vehicle down. And Mr. Mathenge had brake fluid. If he had stepped on the brake pedal, it would have slowed the vehicle down. |

# APPENDIX B

## Grammatical Authorities Cited in Part 2.2

*The Chicago Manual of Style* (16th ed. 2010) ........................................ 89

Bryan A. Garner,
    *The Chicago Guide to Grammar, Usage, and Punctuation* (2016) ... 94

Randolph Quirk et al.,
    *A Comprehensive Grammar of the English Language* (2010) ........ 116

John E. Warriner,
    *English Composition and Grammar: Third Course* (1988) ........... 133

# *The Chicago Manual of Style*

### SIXTEENTH EDITION

The University of Chicago Press

CHICAGO AND LONDON

**5.164**   *Intensifiers.* An adverb can be intensified with words like *very* and *quite* {the very fashionably dressed actor} {everyone ate quite heartily}.

### POSITION OF ADVERBS

**5.165**   *Placement of adverbs.* The adverb should generally be placed as near as possible to the word it is intended to modify. For example, in *the marathoners submitted their applications to compete immediately*, what does *immediately* modify—*compete* or *submitted*? Placing the adverb with the word it modifies makes the meaning clear—for instance, *the marathoners immediately submitted their applications to compete*. A misplaced adverb can completely change a sentence's meaning. For example, *we nearly lost all our camping equipment* states that the equipment was saved; *we lost nearly all our camping equipment* states that almost everything was lost.

**5.166**   *Adverbs modifying intransitive verbs.* If the adverb qualifies an intransitive verb, it should immediately follow the verb {the students sighed gloomily when homework was assigned} {the owl perched precariously on a thin branch}. Some exceptions are *always, never, often, generally, rarely,* and *seldom,* which may precede the verb {mountaineers seldom succeed in climbing K2}.

**5.167**   *Adverbs and linking verbs.* Adverbs do not generally modify linking verbs (see 5.99), such as *be*-verbs, *appear, seem, become, look, smell, taste, hear,* and *feel*. These verbs connect a descriptive word with the clause's subject; the descriptive word applies to the subject, not the verb {he seems modest}. To determine whether a verb is a linking verb, the writer must consider whether the descriptive word describes the action or condition, or the subject. For example, *the sculptor feels badly* literally describes the act of feeling or touching as not done well. But *the sculptor feels bad* describes the sculptor as unwell or perhaps experiencing guilt.

**5.168**   *Adverb within a verb phrase.* When an adverb qualifies a verb phrase, the natural place for the adverb is between the auxiliary verb and the principal verb {the administration has consistently repudiated this view} {the reports will soon generate controversy} {public opinion is sharply divided}. (See 5.102.) Some adverbs may follow the principal verb {you must go quietly} {Are you asking rhetorically?}. There is no rule against adverbial modifiers between the parts of a verb phrase. In fact, it's typically preferable to put them there {the heckler was abruptly expelled} {the bus had been seriously damaged in the crash}. And sometimes it is perfectly appropriate to split an infinitive verb with an adverb to add emphasis or to produce a natural sound. (See 5.106.) A verb's infinitive or *to* form is split when

246

an intervening word immediately follows *to* {to bravely assert}. If the adverb bears the emphasis in a phrase {to boldly go} {to strongly favor}, then leave the split infinitive alone. But if moving the adverb to the end of the phrase doesn't suggest a different meaning or impair the sound, then it's an acceptable way to avoid splitting the verb. Recasting a sentence just to eliminate a split infinitive or avoid splitting the infinitive can alter its nuance or meaning—for instance, *it's best to always get up early* (*always* modifies *get up*) is not quite the same as *it's always best to get up early* (*always* modifies *best*). Moreover, sometimes "fixing" a split infinitive makes the sentence sound unnatural, as in *it's best to get up early always*.

### Prepositions

#### DEFINITION AND TYPES

**5.169** *Prepositions defined.* A preposition is a word or phrase that links an object and an antecedent to show the relationship between them. A preposition's object is usually a noun, or else a pronoun in the objective case {between me and them}, but an adjective, adverb, verb, or phrase may follow instead. Usually a preposition comes before its object, but there are exceptions. For example, the preposition can end a clause, especially a relative clause, or sentence {this isn't the pen that Steve writes with}. And a preposition used with the relative pronoun *that* (or with *that* understood) always follows the object {this is the moment [that] I've been waiting for}. It also frequently, but not always, follows the relative pronouns *which* {Which alternative is your decision based on?} {this is the alternative on which my decision is based} and *whom* {there is a banker [whom] I must speak with} {I can't tell you to whom you should apply}.

**5.170** *Simple and compound prepositions.* Many prepositions are relatively straightforward. A simple preposition consists of a single monosyllabic word—for example, *as, at, by, down, for, from, in, like, of, off, on, plus, since, through, to, toward, up,* and *with.* A compound preposition has two or more syllables; it may be made up of two or more words {into} {outside} {upon}. Some examples are *about, above, across, after, against, alongside, around, before, below, beneath, between, despite, except, inside, onto, opposite, throughout, underneath, until,* and *without.*

**5.171** *Participial prepositions.* A participial preposition is a participial form that functions as a preposition (or sometimes as a subordinating conjunction). Examples include *assuming, barring, concerning, considering, during, notwithstanding, owing to, provided, regarding, respecting,* and *speaking.*

247

Unlike other participles, these words do not create danglers when they have no subject {considering the road conditions, the trip went quickly} {regarding Watergate, he had nothing to say}. See 5.112.

**5.172**   *Phrasal prepositions.* A phrasal preposition (sometimes called a complex preposition) is two or more separate words used as a prepositional unit. These include *according to, because of, by means of, by reason of, by way of, contrary to, for the sake of, in accordance with, in addition to, in apposition with, in case of, in consideration of, in front of, in regard to, in respect to, in spite of, instead of, on account of, out of, with reference to, with regard to,* and *with respect to*. Many of these phrasal prepositions are symptoms of officialese, bureaucratese, or other types of verbose style. If a one-word preposition will do in context, use it. For example, if *about* will serve as well as *with regard to* or *in connection with*, a judicious editor will inevitably prefer to use the simpler expression.

### PREPOSITIONAL PHRASES

**5.173**   *Prepositional phrases defined.* A prepositional phrase consists of a preposition, its object, and any words that modify the object. A prepositional phrase can be used as a noun {for James to change his mind would be a miracle}, an adverb (also called an adverbial phrase) {we strolled through the glade}, or an adjective (also called an adjectival phrase) {the cathedrals of Paris}.

**5.174**   *Prepositional function.* Prepositions signal many kinds of relationships. For example, a preposition may express a spatial relationship {to} {from} {out of} {into}, time {at} {for} {throughout} {until}, cause {because of} {on account of}, means {like} {with} {by}, possession {without} {of}, exceptions {but for} {besides} {except}, support {with} {for}, opposition {against}, or concession {despite} {for all} {notwithstanding}.

**5.175**   *Placement of prepositional phrases.* A prepositional phrase with an adverbial or adjectival function should be as close as possible to the word it modifies to avoid awkwardness, ambiguity, or unintended meanings {Is a person with blond hair named Sandy here?} {the woman with the Popular Front circulates petitions}. If a prepositional phrase equally modifies all the elements of a compound construction, the phrase follows the last element in the compound {the date, the place, and the budget for the wedding have been decided}. Note that if a prepositional phrase with plural objects follows the singular subject of a sentence, the predicate must still be singular—compare the predicate in *the man and two daughters have*

*248*

arrived with that in *the man with two daughters has arrived* and in *the man has arrived with his two daughters*.

**5.176** *Ending a sentence with a preposition.* The traditional caveat of yesteryear against ending sentences with prepositions is, for most writers, an unnecessary and pedantic restriction. As Winston Churchill famously said, "That is the type of arrant pedantry up with which I shall not put." A sentence that ends in a preposition may sound more natural than a sentence carefully constructed to avoid a final preposition. Compare, for example, *this is the case I told you about* with *this is the case about which I told you*. The "rule" prohibiting terminal prepositions was an ill-founded superstition. Today many grammarians use the dismissive term *pied-piping* for this phenomenon.

**5.177** *Clashing prepositions.* If a phrasal verb {give in} precedes a prepositional phrase using the same term {in every argument}, the adverb will clash with the preposition {he gives in in every argument}. Recast the sentence when possible to avoid such repetition—for example, *rather than continue arguing, he always gives in*, or *in every argument, he gives in* (see also 6.44). For more on phrasal verbs, see 5.100.

**5.178** *Elliptical prepositional phrases.* Sometimes a prepositional phrase is elliptical—that is, an independent expression without an antecedent. Often such a phrase starts a clause and can be detached from the statement without affecting the meaning. Elliptical prepositional phrases include *for example, for instance, in a word, in any event, in the last analysis*, and *in the long run* {in any event, call me when you arrive}.

**5.179** *Effect of prepositional phrase on pronoun.* A pronoun that appears in a prepositional phrase is usually in the objective case (see 5.18). There are exceptions. *Than* may function either as a conjunction {he's taller than I [am]} or as a preposition {he's taller than me}. Traditional grammarians prefer the nominative *than I [am]* over the objective *than me*, even though the latter represents common usage. In formal prose, treat *than* as a conjunction requiring a nominative pronoun {she is a more careful researcher than he}.

### OTHER PREPOSITIONAL ISSUES

**5.180** *Prepositions and functional variation.* Some words that function as prepositions may also function as other parts of speech. The distinguishing feature of a preposition is that it always has an object. A word such as

# The Chicago Guide to Grammar, Usage, and Punctuation

Bryan A. Garner

*The University of Chicago Press*
CHICAGO AND LONDON

## Irregular Verbs cont'd

| PRESENT TENSE | PAST TENSE | PAST PARTICIPLE |
|---|---|---|
| upset | upset | upset |
| *wake* | *woke* | *woken* |
| wear | wore | worn |
| weave | wove | woven |
| *wed* | *wed* | *wed* |
| weep | wept | wept |
| *wet* | *wet* | *wet* |
| win | won | won |
| wind | wound | wound |
| withdraw | withdrew | withdrawn |
| withhold | withheld | withheld |
| withstand | withstood | withstood |
| wring | wrung | wrung |
| write | wrote | written |

**142** *Linking verbs.* A linking verb (also called a *copula* or *connecting verb*) is one that links the subject to a closely related word in the predicate—a subjective complement. The linking verb itself does not take an object because it expresses a state of being instead of an action {Mr. Block is the chief executive officer} {that snake is venomous} {his heart's desire is to see his sister again}. There are two kinds of linking verbs: *be*-verbs and intransitive verbs that are used in a weakened sense, such as *appear, become, feel, look, seem, smell,* and *taste.* The weakened intransitive verbs often have a figurative sense akin to that of *become,* as in *He fell heir to a large fortune* (he didn't physically fall on or into anything) or *The river ran dry* (a waterless river doesn't run—it has dried up).

Some verbs only occasionally function as linking verbs—among them *act* {act weird}, *get* {get fat}, *go* {go bald}, *grow* {grow weary}, *lie* {lie fallow}, *prove* {prove untenable}, *remain* {remain quiet}, *sit* {sit still}, *stay* {stay trim}, *turn* {turn gray}, and *wax* {wax eloquent}. Also, some passive-voice constructions contain linking verbs {this band was judged best in the contest} {she was made sales-force manager}.

If a verb doesn't have a subjective complement, then it doesn't qualify as a linking verb in that particular construction. For instance, when a *be*-verb conveys the sense "to be situated" or "to exist," it is not a linking verb {Kansas City, Kansas, is across the river} {there is an unfilled receptionist position}. Likewise, if a verb such as *appear, feel, smell, sound,* or *taste* is followed by an adverbial modifier instead of a subjective complement {he

**81**

**The Traditional Parts of Speech**

appeared in court} or a direct object {the dog smelled the scent}, it isn't a linking verb.

**143**    *Phrasal verbs.* A phrasal verb is usually a verb plus a preposition (or particle) {settle down} {act up} {phase out}. A phrasal verb is not hyphenated, even though its equivalent noun or phrasal adjective might be—e.g., compare *to flare up* with *a flare-up*, and compare *to step up the pace* with *a stepped-up pace.* Three rules apply: (1) if the phrasal verb has a sense distinct from the component words, use the entire phrase—e.g., *hold up* means "to rob" or "to delay," and *get rid of* and *do away with* mean "to eliminate"; (2) avoid the phrasal verb if the verb alone conveys essentially the same meaning—e.g., *rest up* is equivalent to *rest*; and (3) don't compress the phrase into a one-word verb, especially if it has a corresponding one-word noun form—e.g., one *burns out* (phrasal verb) and suffers *burnout* (noun).

> Present-day phrasal verbs remain equally protean. A student who has had the maximum number of loans has "loaned out," not the same as older "lend out" or more recent "max out" meaning "reach and pass one's maximum performance"; cf. "veg [vej] out," "become torpid as though in a vegetative state," and "hulk out," "go into a frenzy like the title character in the television series *The Incredible Hulk.*" A shampoo that "lathers in extra body and manageability" also exemplifies conversion ("lather" as verb) and phrasal verb. Phrasal verbs remain idiomatic, too: "in" and "out" are antonyms, but "fill in" and "fill out" (a blank or form) are virtually synonyms; while to be "all set up" is the opposite of "all upset." Older "fall down" gives "downfall" but newer "melt down" and "fall out" give "meltdown" and "fallout"; likewise "breakthrough" and "kickback." The verb/noun is "shoot out" but "shoot off" gives "offshoot." The verb "take out" gives two nouns, "takeout" if it is food but "outtake" if it is edited film.
> —W. F. Bolton
> *The Language of 1984*

In a phrasal verb, the preposition is an integral part of the verb, serving as an adverb but often with a figurative, idiomatic sense:

- She turned up four new witnesses.
- Put out the candles.
- The interviewer took down everything she said verbatim.

Although you might think at first that a preposition starts a prepositional phrase—that *witnesses, candles,* and *everything* are the objects of prepositions—that is not so. Grammatically, the nouns are direct objects of the verbs shaded in the above examples: in each sentence, the words *up, out,* and *down* could come after instead of before the noun:

- She turned four new witnesses up.
- Put the candles out.
- The interviewer took everything she said down verbatim.

subject (or an unexpressed subject of an imperative) that could logically perform the action of the infinitive. If there is none, then the sentence may be confusing. For example, in *To repair your car properly, it must be sent to a mechanic*, the infinitive *repair* does not have a logical subject; the infinitive phrase *to repair your car* is left dangling. But if the sentence is rewritten as *To repair your car properly, you must take it to a mechanic*, the logical subject is *you*.

## Participles and Gerunds

**151**  *Participles generally.* A participle is a nonfinite verb that is not limited by person, number, or mood, but does have tense. Two participles are formed from the verb stem: the present participle invariably ends in *-ing*, and the past participle usually ends in *-ed*. See § 174.

The present participle consists of the present stem of the verb plus *-ing* {ask–asking}, sometimes with the final consonant of the stem doubled {spin–spinning}. It denotes the verb's action as being in progress or incomplete at the time expressed by the sentence's principal verb {watching intently for a mouse, the cat settled in to wait} {hearing his name, Jon turned to answer}.

The past participle is the third principal part of a verb. For a regular verb, it is formed by adding *-d*, *-ed*, or *-t* to the present stem and is identical with the past tense {call–called–called}. For irregular verbs, there are several patterns: the principal parts of the verb may be identical {slit–slit–slit}, the first and third parts may be identical {run–ran–run}, the second and third parts may be identical {spin–spun–spun}, or all three parts may be different {sing–sang–sung}. The past participle denotes the verb's action as being completed {planted in the spring} {written last year}.

There are other types of participles as well. All verbs have a perfect participle {having called} and a perfect-progressive participle {having been calling}. Transitive verbs have passive forms of the present participle {being called} and of the perfect participle {having been called}.

Participles occur in many types of verb phrases. The past participle appears in the active-voice versions of the present perfect {have called}, the past perfect {had called}, and the future perfect {will have called}. It also appears in all tenses with the passive voice {was called} {were called} {am called}. See § 181 (verb conjugations with *call*).

**152**  *Forming present participles.* The present participle is formed by adding *-ing* to the stem of the verb {reaping} {wandering}. If the stem ends in

**86**

*-ie*, the *-ie* usually changes to *-y* before the *-ing* is added {die–dying} {tie–tying}. If the stem ends in a silent *-e*, that *-e* is usually dropped before the *-ing* is added {giving} {leaving}. There are two exceptions to this rule. The silent *-e* is retained when (1) the word ends with *-oe* {toe–toeing} {hoe–hoeing} {shoe–shoeing}, or (2) the verb has a participle that would resemble another word but for the distinguishing *-e* (e.g., *dyeing* means something different from *dying*, and *singeing* means something different from *singing*). The spelling rules for inflecting words that end in *-y* and for doubling final single consonants are the same as those given in § 174. Regular and irregular verbs both form the present participle in the same way. The present participle is the same for all persons and numbers.

**153**  *Forming past participles.* With regular verbs, the past participle is formed in the same way as the past indicative—that is, the past-indicative and past-participial forms are always identical {stated–stated} {pulled–pulled}. For irregular verbs, the forms are sometimes the same {paid–paid} {sat–sat} and sometimes different {forsook–forsaken} {shrank–shrunk}. See § 141.

**154**  *Participial phrases.* A participial phrase is made up of a participle plus any closely associated word or words, such as modifiers or complements. It can be used (1) as an adjective to modify a noun or pronoun {nailed to the roof, the slate stopped the leaks} {she pointed to the clerk drooping behind the counter}, or (2) as an absolute phrase {generally speaking, I prefer spicy dishes} {they having arrived, we went out on the lawn for our picnic}. For more on participial adjectives, see §§ 121–22, 129.

**155**  *Gerunds.* A gerund is a present participle used as a noun. It is not limited by person, number, or mood, but it does have tense. Being a noun, the gerund can be used as (1) the subject of a verb {complaining about it won't help}; (2) the object of a verb {I don't like your cooking}; (3) a predicate nominative or complement {his favorite pastime is sleeping}; or (4) the object of a preposition {reduce erosion by terracing the fields}. In some sentences, a gerund may substitute for an infinitive. Compare the use of the infinitive *to lie* as a noun {to lie is wrong} with the gerund *lying* {lying is wrong}.

Even though a gerund is always used as a noun, it retains some characteristics of a verb. Specifically, it can take an object {mailing letters kept her busy all day} and it can be modified by an adverb {preparing assiduously enabled him to succeed}.

87

### Phrasal Prepositions cont'd

| | | |
|---|---|---|
| in the case of | on behalf of | up to |
| in the interest of | on the part of | with a view to |
| in the matter of | out of | without regard to |
| in the way of | out of regard for | with reference to |
| in view of | out of respect for | with regard to |
| irrespective of | prior to | with respect to |
| next to | regardless of | with the view of |
| on account of | subsequent to | |

**246**  *Participial prepositions.* A participial preposition is a participial form that functions as a preposition (or sometimes as a subordinating conjunction). Examples are *assuming, barring, concerning, considering, during, notwithstanding, owing to, provided, regarding, respecting,* and *speaking of.* Unlike other participles, these words do not create danglers when they have no subject {considering the road conditions, the trip went quickly} {regarding Watergate, he had nothing to say}. See § 159.

### Prepositional Phrases

**247**  *Generally.* A prepositional phrase consists of a preposition, its object, and any words that modify the object. A prepositional phrase can be used as a noun {for James to change his mind would be a miracle}, an adverb (also called an *adverbial phrase*) {we strolled through the glade}, or an adjective (also called an *adjectival phrase*) {we'd love to see the cathedrals of Paris}.

**248**  *Prepositional function.* Prepositions signal many kinds of relationships. For example, a preposition may express a spatial relationship {to} {from} {out of} {into}; time {at} {for} {throughout} {until}; cause {because of} {on account of}; means {like} {with} {by}; possession {without} {of}; exceptions {but for} {besides} {except}; support {with} {for}; opposition {against}; or concession {despite} {for all} {notwithstanding}.

**249**  *Placement.* A prepositional phrase with an adverbial or adjectival function should be as close as possible to the word it modifies to avoid awkwardness, ambiguity, or unintended meanings {is there a person with a small dog named Sandy here?} {the woman with the Popular Front circulates petitions}.

141

Syntax

## English Sentence Patterns

**297**   *Importance of word order.* English is known as an *analytic language*—one that depends largely on word order. (A *synthetic language,* such as Latin, depends largely on inflectional forms of words.) In the transition from Old English (A.D. 450–1100) to Middle English (1100–1500), the language lost most of its inflected forms—except those for pronouns (*I–me–mine,* etc.). Nouns no longer have nominative and accusative cases. Instead, word order governs meaning.

Consider this example: *Michael likes crystal. Michael* is the subject, *likes* the verb, and *crystal* the object. It's the basic subject–verb–object (SVO) pattern. We deduce the meaning from the position of the words: Michael is an admirer and perhaps a collector of fine glass. If we change it to *Crystal likes Michael,* the meaning is transformed because of the SVO order. We now infer that someone named Crystal thinks fondly about someone named Michael. The SVO pattern is highly significant: it governs the meaning of most English statements. Departures from it typically signal either unusual emphasis or the posing of a question (as opposed to the making of a statement).

**298**   *The basic SVO pattern.* Despite the seeming potential for monotony in having sentence after sentence using the same fundamental word order, English offers enough variety in vocabulary and in sentence elements that can function as subjects, verbs, and objects to keep things interesting. Consider these examples, all of which use the pattern but with interesting levels of sophistication:

- <u>Mary</u>  <u>likes</u>  <u>pomegranates.</u>
     S      V        O

- <u>The man we were talking about</u>  <u>objected to</u>  <u>our arguments.</u>
               S              V            O

- <u>The woman down the street</u>  <u>is selling</u>  <u>loaves of bread.</u>
            S            V          O

- <u>The obstacles that we face</u>  <u>create</u>  <u>opportunities.</u>
            S          V      O

160

Case: 22-5469    Document: 26    Filed: 09/09/2022    Page: 113

**Sentences, Clauses, and Their Patterns**

- How you think of yourself  affects both the way you approach
  <br>S                 V            O
  the problems of everyday life and the degree to which you're
  <br>O                 O
  perceived as being well-adjusted.
  <br>O

**299**   *All seven patterns.* Syntactic patterns other than the SVO pattern are available, but they are limited to specific types that range from two to four of these elements: subject (S), verb (V), [direct] object (O), indirect object (IO), complement (C), adverbial (A). Here are all seven basic clause patterns:

- S + V              Sandy smiled.
- S + V + O          Sandy hit the ball.
- S + V + C          Sandy is eager.
- S + V + A          Sandy plays well.
- S + V + IO + O     Sandy gave Jerry the ball.
- S + V + O + C      Sandy got her bag wet.
- S + V + O + A      Sandy wrote her score on the card.

**300**   *Variations on ordering the elements.* When clause elements appear in a different order, the inversion may indicate either a question {is Sandy all right? [V–S–C]} or a special kind of emphasis:

- Sandy Winn  my name  is!
  <br>C        S    V
- Bully  you  say!
  <br>O   S   V

Inversions of this type achieve a special emphasis precisely because they depart from the normal sequence of sentence elements.

**301**   *Constituent elements.* Grammarians use the term *constituent* to denote a word or phrase constituting part of a larger grammatical construction. As the fundamental building blocks of a grammatical sentence, the subject and predicate are the two broadest constituents. Unless the sentence comprises only a simple subject and a simple predicate {Bill runs}, one or both of these constituents will have constituents of their own, called *immediate constituents.*

In the sentence *People who exercise regularly are healthier than those who don't,* both subject and predicate have immediate constituents.

**161**

- 101 -

# *Traditional Sentence Diagramming*

**339**    ***History and description.*** The traditional system of sentence diagramming bears the names of its developers, Alonzo Reed and Brainerd Kellogg, who in 1878 introduced it in two grammar texts: *Graded Lessons in English* and *Higher Lessons in English*. Reed–Kellogg diagrams show each word in a sentence placed according to its function. The subject and the main verb—along with any predicate nominative, predicate adjective, direct object, or indirect object—occupy the main horizontal line and show the

> I really do not know that anything has ever been more exciting than diagramming sentences. I suppose other things may be more exciting to others when they are at school but to me undoubtedly when I was at school the really completely exciting thing was diagramming sentences and that has been to me ever since the one thing that has been completely exciting and completely completing.
> —Gertrude Stein
> "Poetry and Grammar"

core thought communicated by the sentence (the kernel sentence). Adjectives and adverbs are attached to the words they modify on descending diagonal lines. Reed and Kellogg were not the first to develop such a scheme: predecessors date back to the first half of the 19th century, using rectangles or balloons to hold the words instead of lines. But Reed and Kellogg's grammars were widely adopted, and Reed–Kellogg diagrams—with some refinements—were standard teaching tools for much of the 20th century. They fell out of favor in elementary and secondary schools in the 1960s, along with formal classroom units in grammar generally.

**340**    ***Benefits of diagrams.*** Diagrams help you recognize sentence patterns (e.g., a predicate nominative or predicate adjective with a linking verb, a direct object with a transitive verb, subordinate clauses, prepositional phrases). By showing the primary parts of the sentence on the baseline, diagrams can help you sort out how all the other words fit into the syntax. By separating the words according to their functions, diagrams can help you spot some common grammatical errors—such as disagreement in number and case, or lack of parallelism in compound constructions. With an especially complex sentence, a diagram can help reveal the writer's meaning.

Syntax

**341**   ***Using diagrams.*** A sentence does not have to be diagrammed fully and rigorously for the exercise to be useful. An informal sketch of just a discrete syntactical unit can also help you decide whether a singular or plural verb is needed or whether a pronoun in a certain position should be in the nominative or objective case. An adept can diagram mentally rather than by physically drawing it on paper.

> Churchill reports that the most valuable training he ever received in rhetoric was in the diagramming of sentences. Think of it! Yet the diagramming of a sentence, regardless of the grammatical system, can be a live subject as soon as one asks not simply "How is this sentence put together?" but rather "Why is it put together in this way?" or "Could the rhetorical balance and hence the desired persuasion be better achieved by writing it differently?"
> —Wayne C. Booth
> "The Rhetorical Stance"

**342**   ***Criticisms.*** Critics of diagramming say that it does not reflect modern concepts of grammar and that by abandoning the flow of prose in favor of a logical reordering, a diagram can make understanding the meaning harder, not easier. The attack on the classroom use of diagrams was part of a larger assault on traditional grammar generally. More specifically, some curriculum reformers thought grammar lessons took away class time that could be better spent on other pursuits, such as literature. But many other teachers and students have found diagramming to be an extremely useful pedagogical device.

**343**   ***How diagrams work.*** While there are variations on the Reed–Kellogg forms for representing some grammatical functions, with each of these the core structure and the arrangement of related words, phrases, and clauses are largely unchanged. The alterations in style reflect such details as representing the two constituents of correlative conjunctions (e.g., *not only–but also*) together on a dotted line, or separating them so that each correlative appears close to the words it introduces.

**344**    ***Baseline.*** The main baseline of a sentence (or independent clause) is central to the sentence's diagram, containing its nucleus of meaning—the subject and verb, plus any direct object or subjective complement. It consists of a horizontal line divided by a vertical line running through it. On the left of the line is the subject, on the right the predicate. It can be as simple as a noun or pronoun and a verb:



*Time* is the subject; *flies* is the verb.

With the imperative mood, a diagram may consist of the verb alone (the noun or pronoun being implied):



*Wait* is the verb. The subject is understood as *you*.

Connected to the horizontal line is every other element of the sentence—usually modifiers (e.g., adjectives, adverbs, prepositional phrases, relative clauses) but sometimes also appositives, absolute constructions, expletives, and more. Some attach above the line, some below. Similar lines are used for other clauses, whether independent or subordinate, so it's helpful to indicate the priority of the main baseline of the sentence (or of each independent clause in a compound sentence) in some way, such as by using a thicker line or by starting the line a little farther to the left than other elements on the diagram.

Syntax

**345**  *Subject.* The subject of a clause may be a single word, a noun phrase, or a noun clause. It is in the nominative case. In the active voice, the subject is the agent or actor causing the verb's action or state; in the passive voice, the subject is the recipient of the verb's action or state.



*Justice* is the subject, *prevails* the verb.

*Justice* is the subject of this passive-voice sentence.
It is the recipient of the action of the verb *is served*.

**346**  *Predicate.* The predicate always contains the main verb and any auxiliary verbs and particles (idiomatic prepositions that are essential to the nonliteral meaning of a phrasal verb, as with *out* in *I'll check it out*). Most predicates also include either a direct object or a subjective complement, and some also include a complement associated with the direct object.



*Happened upon* (= to discover) is a phrasal verb. *Have* is capitalized because it begins the sentence; *upon*, usually a preposition, is an idiomatic particle that is part of the phrasal verb.

**347**  *Direct object.* A direct object is a noun or pronoun representing the recipient of the verb's action or state. If it's a pronoun, it's in the objective case. A direct object appears on the predicate side of the baseline, next to the verb but separated from it by a vertical line above the baseline.



*Eggs* is the direct object of the verb *lay*.

184

**348**    ***Objective complement.*** An objective complement functions as a noun or adjective and names or describes the outcome of some change the verb makes to the direct object (e.g., *king* in *Who made you king?* or *wet* in *The rain got us wet*). In other words, it completes the action of the verb. In a diagram, the objective complement appears to the right of the direct object and separated from it by a back-slanted line (pointing toward the direct object).



Peanuts make me thirsty.

*Thirsty* is an objective complement. Here it is an adjective completing the action that the verb, *make*, has on the direct object, *me*.



The board named Hale superintendent.

*Superintendent* is an objective complement. Here it is a noun referring to the direct object, *Hale*, and completing the action of the verb, *named*.

**349**    ***Indirect object.*** An indirect object names the recipient of the verb's action on the direct object (e.g., *me* in *Hand me the pliers*). It is the functional equivalent of a *to*-prepositional phrase after the direct object (*to me* in *Hand the pliers to me*)—except that the indirect object is preposed and the *to* is dropped. On a diagram, the indirect object is placed on a horizontal line below the verb and connected to it by a diagonal line.



Did you give Casey tickets?

*Casey* is the indirect object of the verb *did give*; *tickets* is its direct object.

Syntax

**350**   *Subjective complement.* A subjective complement is either a predicate nominative (e.g., *accountant* in *Merrill is an accountant*) or a predicate adjective (e.g., *great* in *Indian food sounds great*). It is separated from the verb by a back-slanted line above the baseline (pointing toward the subject). It may accompany either a *be*-verb or a linking verb such as *seem, become, grow,* or *taste.*



| Something smells delicious. |

| Something | smells \ **delicious** |

*Delicious* is a subjective complement in the form of a predicate adjective.
It describes the subject, *something.*

| Allen Konigsberg became Woody Allen. |

| Allen Konigsberg | became \ **Woody Allen** |

*Woody Allen* is a subjective complement
in the form of a predicate nominative.
It refers directly to the subject, *Allen Konigsberg.*

**351**   *One-word modifiers.* A modifier adds information about a noun (in the case of an adjective) or a verb, adjective, or adverb (in the case of an adverb). It may be a one-word adjective, adverb, or article, or it may be a phrase (most frequently a prepositional phrase) or a subordinate clause. The function it plays in the sentence determines its placement in a diagram. A one-word modifier is placed on a diagonal line below the word it modifies.

| Our first crop survived the long drought fairly well. |

| crop | survived | drought |

*Our* is a possessive pronoun and *first* is an adjective; both independently modify
the noun *crop.* The adverb *well* modifies the verb *survived*
and is itself modified by the adverb *fairly.* The article *the* and the
adjective *long* independently modify the noun *drought.*

Traditional Sentence Diagramming

**352**  *Prepositional phrases.* A prepositional phrase couples a preposition (e.g., *at, before, of*) with a noun or pronoun as its object. It may function as an adjective or an adverb. In a diagram, a prepositional phrase appears under the word it modifies, on a branch consisting of a diagonal line holding the preposition and a horizontal line holding its object.



This sentence contains four prepositional phrases:
*on a shelf* modifies the subject, *box; in my closet* modifies the
object of that preposition, *shelf; to my father* modifies the
direct object, *letters,* as does *from his Irish cousins.*

**353**  *Adjective clauses.* An adjective clause is a subordinate clause that modifies a noun in another clause, either further defining it (a restrictive clause) or adding supplementary but nonessential information about it (a nonrestrictive clause). It may be introduced by a relative pronoun (*that, whichever, who, whom,* or *whose*) or a subordinating conjunction (e.g., *when, where, whatever, why, how*). (See §§ 271–73.) The clause is put on a separate diagram below the diagram holding the word it modifies, and connected to it by a dashed line from the modified word to the relative pronoun or adverb that introduces the adjective clause.



This sentence contains two adjective clauses:
*where I grew up,* which modifies the subject, *town;* and
*which never worked,* which modifies the direct object, *light.*

187

Syntax

**354**  *Adverbial clauses.* An adverbial clause is a subordinate clause that modifies a verb, adjective, or adverb in another clause by specifying its time, place, duration, amount, cause, purpose, or condition. It is introduced by a subordinating conjunction (e.g., *when, whenever, where, if, as soon as, although, once, before*). In a diagram, an adverbial clause is much like an adjective clause, but the modified word in the independent clause is connected to the verb in the subordinate clause with a dashed line. The subordinating conjunction appears on the dashed line.



The adverbial clause *shortly after the sun came up* tells when the troop broke camp. The adverb *shortly* modifies the subordinating conjunction *after*.

**355**  *Noun clauses.* A noun clause is a subordinate clause that functions as the subject or object of another clause. A noun clause is diagrammed on a separate baseline above the clause and connected to it by a "pedestal" (a vertical line atop a delta of two short diagonal lines). Its placement in the diagram depends on its function in the sentence.



The subordinate noun clause *Whoever wants it* is the subject of the sentence; the subordinate noun clause *whatever's left* is the object of the preposition *to*.

188

A noun clause may be introduced by a conjunction (e.g., *that*) or an adverb (e.g., *where* or *if*). Some writers tend to omit *that* in a noun clause, but doing so can sometimes cause a brief miscue.



The board believed that the accountant's opinion was ill-considered.

Without the conjunction *that*, *opinion* seems at first to be the object of *believed*—when in fact it is the subject of the relative clause *the accountant's opinion was ill-considered*.

A noun clause may also be introduced by an interrogative pronoun (e.g., *why, when, where*), an adjective (e.g., *which, whose, what*), or an adverb (e.g., *when, how, why*).



Who knows where the time goes?

The noun clause *where the time goes* is the object of the main verb, *knows*. Within the subordinate clause, *where* modifies the verb *goes*.

**356**   *Infinitives.* An infinitive is a verb typically introduced by *to* (e.g., *to fish* in *I like to fish*)—see § 147. With a bare infinitive, the *to* is omitted (e.g., before *laugh* in *Don't make me laugh*). When an infinitive is part of the main verb, it is diagrammed (with *to* unless it's a bare infinitive) on the baseline like any other verb. An infinitive phrase may take an object (e.g., *a secret* in *Do you want to know a secret?*) and may function as a noun, an adjective, or an adverb. The phrase is diagrammed on a branch just as a prepositional phrase is, with *to* on the diagonal line. If it serves as a noun, its diagram appears on a pedestal. If it serves as an adjective or adverb, it goes below the word it modifies.



You ought to think this through.

The infinitive *to think* is the main verb, along with its modal auxiliary *ought*. In this function, the infinitive is diagrammed the same way as any other verb, on the baseline. *To* is also put on the baseline as part of the infinitive phrase.

189

Syntax



The infinitive phrase *to become an architect* is used as a noun, serving as the sentence's predicate nominative linked to the subject *ambition* by the main verb *was*.

The infinitive phrase *to reach the high notes* is used as an adjective modifying *capacity*. Its diagram is placed below the modified word.

**357**   ***Participles.*** The participles of a verb (see § 151) are its inflected forms typically ending in *-ed* (the past participle) and *-ing* (the present participle), though the past participle of an irregular verb may be unpredictable (e.g., *told, written*). With auxiliary verbs, participles function as verbs in the progressive and perfect tenses (e.g., *is missing* or *has missed*). The past tense is also used with a *be*-verb to form the passive voice (e.g., *is missed* in *He is sorely missed*, or *was missed* in *The deadline was missed*). A participle may also function without an auxiliary as an adjective (e.g., *the missing link, a missed opportunity*). Like a verb, it can take an object. As an adverb, a participle is diagrammed under the word it modifies, curved around a diagonal line connected to a horizontal line. Its object goes on the horizontal line, separated from the participle by a vertical line above the line.



The main verb, *spun*, is the past participle of the irregular verb *spin*, used in this sentence to form the past-perfect tense. As a verb, it is diagrammed on the baseline with its auxiliary verb, *had*.

**Traditional Sentence Diagramming**



*Given those options* is a participial phrase modifying the subject, *we. Guided* is a participle standing alone and modifying the direct object, *tour.*

**358**   ***Gerunds.*** A gerund is the present participle of a verb (with its *-ing* ending) functioning as a noun in the sentence {I enjoy reading and painting} (see § 155). It's distinguished from the present participle when used as a verb in the progressive tenses {I have been reading all morning; this afternoon I'll be painting}. A gerund may take an object and modifiers {I enjoy reading biographies and painting landscapes of the mountains}. It is diagrammed as a present participle just as any other verb is. A gerund phrase appears on a separate baseline above the main baseline on a pedestal, with the gerund draped around a line with a vertical offset. Like other nouns, a gerund may also be used attributively and function as an adjective. When that is so, it is diagrammed the same way as any other adjective, on a straight diagonal line below the word it modifies.



The gerund *fishing* is a noun functioning as the subject of the sentence. Because it is not part of a phrase, it needs no special formatting here.



Here, the gerund *fishing* (still a noun) is used adjectivally to modify the subject *tackle.* Because it is not part of a phrase, it needs no special formatting.

**191**



Since his retirement, fishing the streams of Oregon has been his whole life.

Here, the subject is the gerund phrase *fishing the streams of Oregon*. The phrase is diagrammed with a separate main axis atop a pedestal linked to its place in the main sentence.

**359**   *Appositives.* An appositive is a noun, pronoun, or phrase standing beside a noun element and further identifying it or adding information about it (see § 40). An appositive usually follows the word with which it is associated, but it may also precede that word. An appositive is diagrammed in parentheses beside the word to which it refers (and atop a pedestal if it is a clause). Any modifiers in an appositive phrase are placed on the baseline below the main appositive and inside the parentheses.



Mrs. Roush, my fifth-grade teacher, taught me sentence diagramming.

*My fifth-grade teacher* is an appositive, identifying *Mrs. Roush*.

**360**   *Independent elements.* Several types of constructions use words that serve no grammatical function in the sentence: vocatives (words of direct address), interjections (see § 280), expletives that stand in for the subject in an inverted sentence (see § 193), absolute constructions (see p. 401), and sentence adverbs (see § 211). They are all diagrammed on a separate line or lines above or beside the baseline but not connected to it.



Naturally, we had to stop at the snake farm.

*Naturally* is a sentence adverb. It serves no grammatical function in the sentence but addresses something about the sentence as a whole.

192

**Traditional Sentence Diagramming**



*Mr. Gorbachev* is a proper noun of direct address, serving
no grammatical function in the sentence.

**361**    *Conjunctions.* A conjunction joins two or more sentence parts, whether
words, phrases, or clauses. It is diagrammed on a dashed line connect-
ing the things it joins. An internal compound structure is diagrammed
on a branch that splits into as many separate but parallel structures as
there are items in the compound, with the parallel structures connected
by a dashed line holding the conjunction that joins them. Correlative
conjunctions (e.g., *either–or, not only–but also*) go together on the con-
necting line, with each part close to the item with which it is associated
in the sentence.



The conjunction *and* joins two direct objects, *hat* and *jacket*.
The conjunction *but* joins the adjectives *grueling* and
*inspirational*, both of which modify *hike*.

**362**    *Diagramming compound sentences.* A compound sentence consists of
two or more independent clauses, usually (but not always) joined by a
conjunction. (See § 293.) The clauses are joined by a dashed line with
a short horizontal section holding the conjunction. The dashed line
attaches to the baselines at the main verbs.

**193**

Syntax


Power tends to corrupt, and absolute power corrupts absolutely.



The independent clauses *power tends to corrupt* and *absolute power corrupts absolutely* could stand alone as complete sentences. *And* is a coordinating conjunction.

**363** *Diagramming complex sentences.* A complex sentence consists of an independent clause and at least one dependent clause linked by a relative pronoun (e.g., *that, which, who*), an adverb (e.g., *where, when, why*), or a subordinating conjunction (e.g., *if, after, because*). (See § 295.) The clauses are joined by a slanting dashed line connecting the two linked elements.

We'll be late because it started snowing.



The independent clause *we'll be late* could stand alone. The subordinate clause *because it started snowing* could not, but serves as an adverbial modifier explaining why.

**364** *Diagramming compound-complex sentences.* A compound-complex sentence contains two independent clauses and at least one dependent clause. (See § 296.) The independent clauses are joined by a dashed line with a short horizontal section holding a conjunction (as with a compound sentence), and the dependent clause is joined by a slanting dashed line connecting it to one of the independent clauses (as with a complex sentence).

Because Suyash was late, he was rushing to class, and he forgot his phone.



The independent clauses are *he was rushing to class* and *he forgot his phone*. The dependent clause *because Suyash was late* attaches to the first.

194

# A COMPREHENSIVE GRAMMAR OF THE ENGLISH LANGUAGE

**Randolph Quirk**
**Sidney Greenbaum**
**Geoffrey Leech**
**Jan Svartvik**

### Index by David Crystal

 **Pearson**

### Adjectives and participles

**7.15**  There are many adjectives that have the same suffixes as participles in *-ing* or *-ed* (including the variants of *-ed*). These will be called PARTICIPIAL ADJECTIVES:

| PREDICATIVE USE | ATTRIBUTIVE USE |
|---|---|
| His views were very *surprising*. | ~ his *surprising* views |
| The man seemed very *offended*. | ~ the *offended* man |

They include forms in *-ed* that have no corresponding verbs:

| | |
|---|---|
| The results were *unexpected*. | ~ the *unexpected* results |
| Her children must be *downhearted*. | ~ her *downhearted* children |
| All his friends are *talented*. | ~ his *talented* friends |
| His lung is *diseased*. | ~ his *diseased* lung |

When there are no corresponding verbs (\*to unexpect, \*to downheart, \*to talent, \*to disease), the forms are obviously not participles (cf Note below).

When there is a corresponding verb, attributively used *-ed* forms usually have a passive meaning (cf 17.29), eg:

> *lost* property ~ property that *has been lost*

In some cases, however, the *-ed* participle is not interpreted as passive. The passive interpretation is excluded if the corresponding verb can be used only intransitively:

> the *escaped* prisoner ['the prisoner who has escaped']
> the *departed* guests ['the guests who have departed']

But even in other instances, the participle relates to the intransitive use of the verb; thus the passive interpretation is impossible in:

> a *grown* boy ['a boy who has grown (up)']

It is unlikely in:

> the *faded* curtains ['the curtains which have faded']
> the *retired* manager ['the manager who has retired']

Predicative use occurs only with some of these participial adjectives:

> The curtains are *faded*.
> Her father is now *retired*.
> Her son is *grown*. [dubious in BrE, but *full-grown* or *grown-up* is fully acceptable]
> The guests are *departed*.

The last example is archaic, unlike the acceptable *the departed guests* (cf the reverse situation with *go*: *The guests are gone*, \**the gone guests*). But contrast:

> \*The prisoner is *escaped*.

Sometimes there is a corresponding verb, but it has a different meaning. We can therefore have ambiguous sentences where the ambiguity depends on whether the word is a participle or a participial adjective:

| | |
|---|---|
| ADJECTIVE: | She is (very) *calculating* (but her husband is frank). |
| PARTICIPLE: | She is *calculating* (our salaries). ['. . . so don't disturb her while she is doing the arithmetic.'] |
| ADJECTIVE: | They were (very) *relieved* (to find her at home). |
| PARTICIPLE: | They were *relieved* (by the next group of sentries). |

Notice that we can replace *be* by *seem* only with the adjectives (*cf* 3.77 on pseudo-passives):

> She seems very calculating.
> *She seems calculating our salaries.

Note  [a] *Unexpected* corresponds to the *-ed* participle of *expect* plus the negative particle: *unexpected* ~ *not expected*. However, such *un-* + verb + *-ed* forms are not participles, since there is no verb *un-* + verb, *eg*: *°unexpect* (unlike *undress*, etc). Unlike *expected*, *unexpected* can be premodified by *very*, so that the morphological change has been accompanied by a semantic/syntactic change. The situation is less clear for the morphologically negative forms *unwritten* (*eg*: *unwritten law*) and *unbroken* (*eg*: *unbroken succession*), which resemble the positive forms in not accepting *very* (but *cf* 7.16 Note and App 1.21).
[b] Nouns can also have adjective derivatives in *-ed* (*cf* App 1.38), *eg*: *hard-hearted*, *talented*, *four-legged*, *flat-bottomed*, *bearded*.

**7.16**  Often the difference between the adjective and the participle is not clear-cut (*cf* 17.98*ff*). The verbal force of the participle is explicit for the *-ing* form when a direct object is present. Hence, the following *-ing* forms are participles that constitute a verb phrase with the preceding auxiliary (*cf* 3.52*ff*):

> Her views were *alarming* her audience.
> You are *frightening* the children.
> They are *insulting* us.

Similarly, the verbal force is explicit for the *-ed* form when a *by*-agent phrase with a personal agent (*cf* 3.63*ff*, 8.80*f*) is present, indicating the correspondence to the active form of the sentence:

> The man was *offended* by the policeman.
> He is *appreciated* by his students.
> She was *misunderstood* by her parents.

For both participle forms, premodification by the intensifier *very* is an explicit indication that the forms have achieved adjective status:

> Her views were very *alarming*.
> You are very *frightening*.
> The man was very *offended*.

BUT: He is $\left\{ \begin{array}{l} \text{?very} \\ \text{very much} \\ \text{highly} \end{array} \right\}$ *appreciated*.

We might therefore expect that the presence of *very* together with an explicit indicator of verbal force would produce an unacceptable sentence. This is certainly so for the *-ing* participle form:

> *His views were very *alarming* his audience.

- 118 -

However, with the *-ed* participle, there appears to be divided usage, with increasing acceptance of the cooccurrence of *very* with a *by*-agent phrase containing a personal agent:

> ?The man was very *offended* by the policeman.

In the absence of any explicit indicator, the status of the participle form is indeterminate:

> The man was *offended*.

For the *-ed* form in this example, the participle interpretation focuses on the process, while the adjective interpretation focuses on the state resulting from the process. For the *-ing* form the difference is perhaps clearer. In the sentence *John is insulting*, with no object present, the participle interpretation is implausible because the verb is normally transitive. If, however, the participle interpretation is selected, then the sentence expresses that John is in the process of giving insults and we expect an object, while in the adjective interpretation, the sentence points to a characteristic of John (*cf*: *John is rude*). A participle interpretation is similarly unlikely for the following sentences:

| | |
|---|---|
| She is *surprising*. | ~ ?She *surprises*. |
| He is *interesting*. | ~ ?He *interests*. |
| It is *exciting*. | ~ ?It *excites*. |
| It is *tempting*. | ~ ?It *tempts*. |

Note    Whereas gradable adjectives and adverbs are intensified by *very*, verbs are intensified by other intensifying adverbs such as *much* and *well* (*cf* 8.104*ff*), which themselves are often premodified by *very*, eg: *very much*, *very well*. The applicability of this criterion depends on whether the words are gradable, since (as we have seen in 7.3*f*) not all adjectives are gradable. Hence, if the corresponding verb allows (say) *very much* while the participle form disallows *very*, we have a good indication that the form in question is a participle rather than an adjective:

> She loved him *very much*.
> ~ He was *very much* loved (by her).
> ~ He was loved *very much* (by her).
> ~ (?*)He was *very* loved.

Generally, *-ed* participle forms accepting *very* can retain *very* when they cooccur with a *by*-phrase containing a nonpersonal semi-agent (*cf* 3.76):

> I'm *very disturbed* by your attitude.
> We were *very pleased* by his behaviour.

Also, as we have seen, personal agents sometimes occur in this construction, as in:

> ?I was *very influenced* by my college professors.

**7.17** The participle sometimes reaches full adjective status when it is compounded with another element:

| | |
|---|---|
| The eggs are *boiled* hard. | ~ The eggs are (very) *hard-boiled*. |
| It is *breaking* my heart. | ~ It is (very) *heart-breaking*. |
| He was *bitten* (by a snake). | [*cf*: He was *frost-bitten*.] |

When an adjective or adverb is the first element of the compound, as in *hard-boiled*, an intensifier such as *very* can be interpreted as related to the first element rather than to the compound as a whole.

**468  Adjectives and adverbs**

### Postpositive

**7.21**  Adjectives can sometimes be postpositive, *ie* they can immediately follow the noun or pronoun they modify. We may thus have three positions of adjectives:

| | | |
|---|---|---|
| PREDICATIVE: | This information is *useful*. | [1] |
| ATTRIBUTIVE: | *useful* information | [2] |
| POSTPOSITIVE: | something *useful* | [3] |

A postpositive adjective (together with any complementation it may have; *cf* 7.22) can usually be regarded as a reduced relative clause:

> something *that is useful* [3a]

Compound indefinite pronouns and adverbs ending in *-body*, *-one*, *-thing*, *-where* (*cf* 6.46*f*, 17.57) can be modified only postpositively:

> *Anyone* (who is) *intelligent* can do it.
> I want to try on *something* (that is) *larger*.
> We're not going *anywhere very exciting*.

Of course, adjectives that can occur only attributively (*cf* 7.32*ff*) are excluded:

> *something (which is) *main*    *somebody (who is) *mere*

Postposition is obligatory for *proper* meaning 'as strictly defined', *eg*:

> the City of London *proper*

In several institutionalized expressions (mostly in official designations), the adjective is postpositive (*cf* 17.59), *eg*:

| | |
|---|---|
| the president *elect* | vice-chancellor *designate* |
| ['soon to take office'] | postmaster *general* |
| heir *apparent* | court *martial* |
| attorney *general* | notary *public* |
| from time *immemorial* | body *politic* |

Note also:

> the person *opposite* [BUT: the *opposite* direction]
> all of us, me *included* [BUT: *including* me]
> Monday to Friday *inclusive* ⟨AmE also: Monday *through* Friday; *cf* 9.37⟩
> Longman Group *Limited*/*Ltd* ⟨UK⟩; Harcourt Brace Jovanovich, *Incorporated*/*Inc* ⟨US⟩

| | |
|---|---|
| Asia *Minor* | Poet *Laureate* |
| devil *incarnate* | all things *English* |
| the best car *going* | B *flat*/*sharp*/*major*/*minor* |

Adjectives ending in *-able* and *-ible* can have postposition when the noun is modified by another adjective in the superlative degree (*cf* 7.74*ff*), by *only*, or by the general ordinals *last*, *next*, etc (*cf* 5.22). We thus have either attributive position or postposition in:

| | |
|---|---|
| the best *possible* use | ·~ the best use *possible* |
| the greatest *imaginable* insult | ~ the greatest insult *imaginable* |

|                         |                                |
|-------------------------|--------------------------------|
| the best *available* person | ~ the best person *available* |
| the only *suitable* actor   | ~ the only actor *suitable*   |

The deverbal suffix *-able/-ible* combines with transitive verbs to produce gradable adjectives: 'of the kind that can be V-ed' (*cf* App I.40). Some postpositive adjectives, especially those ending in *-able* or *-ible*, retain the basic meaning they have in attributive position but convey the implication that what they are denoting has only a temporary application. Thus, *the stars visible* refers to stars that are visible at a time specified or implied, while *the visible stars* more aptly refers to a category of stars that can (at appropriate times) be seen. We have a similar distinction between the temporary and the permanent in *rivers navigable* and *navigable rivers*.

*Appointed, desired, required; following, past, preceding;* and *positive* also occur in either position:

|                         |                                |
|-------------------------|--------------------------------|
| at the *appointed* time | ~ at the time *appointed*      |
| in *past* years         | ~ in years *past*              |
| the *preceding* years   | ~ the years *preceding*        |
| *positive* proof        | ~ proof *positive*             |

Postposition is usual with the set phrase *pure and simple*, as in *the answer/truth pure and simple*.

Postposition (in preference to attributive position) is usual for a few *a*-adjectives (*cf* 7.10*f*) and for the four adjectives *absent, present, concerned, involved* when they designate 'temporary' as opposed to 'permanent' attributes (*cf* 17.7):

The house (which is) *ablaze* is next door to mine.
The boats (which were) *afloat* were not seen by the bandits.
The men (who were) *present* were his supporters.
The people (who were) *involved* were not found.

[*cf: the involved people*, which designates a permanent attribute, but *cf* Note [b]]

Postposition is used with *net* and *gross* when the precise amounts are stated:

He was paid a fee of *£12 gross*, on which he had to pay £4 tax, leaving the sum of *£8 net*. [BUT: *The gross sum* was £12. *The net sum* was £8.]

Compare *total*:

The $\left\{ \begin{array}{l} sum\ total \\ total\ sum \end{array} \right\}$ was £12.

Note    [a] The postpositive adjective, as in *the president elect* and *vice-chancellor designate*, reflects a neoclassical style based on Latin participles and much in vogue in Elizabethan times. *Cf* the normal attributive position of English participles; 17.98*ff*:

the *elected* president, the *acting* professor

[b] Attributive *present* normally has temporal meaning (*eg: at the present time*); but it has the same sense as postpositive *present* (*ie* the antonym of *absent*) in the fixed expression *present company excluded* (where perhaps it has been transposed from its usual position because the participle has occupied that position) and in expressions that seem to be based on it, *eg: excluding present company* ('if we exclude present company').

In AmE, attributive and postpositive *involved* and *concerned* may have the same sense if the head of the noun phrase is *party* or *parties*:

the *involved* party, the *concerned* parties

**Adjectives with complementation**

**7.22**  Adjectives with complementation (*cf* 16.68*ff* ) normally cannot have attributive position but require postposition. Compare:

a *suitable* actor    BUT NOT:  *a *suitable for the part* actor

The complementation can be a prepositional phrase or a *to*-infinitive clause:

I know an actor *suitable for the part*.                        [1]
They have a house *larger than yours*.                        [2]
The boys *easiest to teach* were in my class.                    [3]
Students *brave enough to attempt the course* deserve to succeed.    [4]

The postpositive structures can of course be regarded as reduced relative clauses:

I know an actor *who is suitable for the part*.                    [1a]

If the adjective is alone or merely premodified by an intensifier, postposition is not normally allowed:

*They have a house (*much*) *larger*.
*The soldiers (*rather*) *timid* approached their officer.

However, if the noun phrase is generic and indefinite, coordinated adjectives, or adjectives with some clause element added, can be postposed, though such constructions are formal and rather infrequent:

Soldiers *timid or cowardly* don't fight well.                    [5]
Soldiers *normally timid* don't fight well.                      [6]
A man *usually honest* will sometimes cheat.                    [7]

The more usual constructions are premodification or a relative clause:

*Timid or cowardly* soldiers . . .                          [5a]
Soldiers *who are timid or cowardly* . . .                      [5b]
Soldiers *who are normally timid* . . .                        [6a]
A man *who is usually honest* . . .                          [7a]

Like relative clauses, postposed adjectives may be restrictive or nonrestrictive, *eg*:

*Soldiers normally timid* don't fight well.
    ['Soldiers who are . . .'] [generic and indefinite noun head]        [6]
*The soldiers, normally timid*, fought bravely.
    ['The soldiers, who were . . .'] [specific and definite noun head]    [6b]

The adjective of an adjective phrase can often be attributive, leaving its complementation in postposition. Thus, equivalent to sentences [2] and [3] are the somewhat more informal sentences [2a] and [3a]:

They have a *larger* house *than yours*.                      [2a]
The *easiest* boys *to teach* were in my class.                  [3a]

An adjective modified by *too* or *so* can be separated from its complementation if placed before the indefinite (or zero) article of the noun phrase; so too, beside the more usual 'a brave enough student to':

She is *brave enough* a student *to attempt the course*.                    [8]

It was *too boring* a book *to read*.                                        [9]

With *enough*, the construction is more common if the adjective is premodified by *not*, as in [8a]:

She is *not brave enough* a student *to attempt the course*.                [8a]

But with *enough* and *too*, this construction seems to be possible only if the adjective phrase is part of the subject complement or object complement (compare [8] and [8b]):

*\*Brave enough* a student *to attempt the course* deserves to succeed.      [8b]

With *so*, the construction is also possible if the adjective phrase is part of the subject or object [10]:

A man *so difficult*  
*So difficult* a man } *to please* must be hard to work with.               [10]

Exceptionally, certain short prepositional phrases may also premodify an adjective in attributive position:

a *by no means* irresponsible action

~ an action (which is) by no means irresponsible

Compound modifiers usually denoting measurements may have either attributive or postpositive position (note also the *foot* ~ *feet* shift):

a *5000-foot high* mountain    ~ a mountain (which is) 5000 feet high

Note    We find the postposition of adjectives in poetry in cases where attributive position is the norm elsewhere in the language, *eg*:

Ben Battle was *a soldier bold* . . . (Thomas Hood)

### Adjectives as heads of noun phrases

7.23    Adjectives can function as heads of noun phrases, which (like all noun phrases) can be subject of the sentence, complement, object, and prepositional complement. Adjectives as noun-phrase heads, unlike nouns, do not inflect for number or for the genitive case and they usually require a definite determiner (*cf* 5.56, App I.45).

Adjectives are typically used as heads of noun phrases to refer to certain fairly well-established classes of persons, *eg*: *the brave, the weak, the maladjusted, the elderly, the underprivileged*.

There are three types of adjectives functioning as noun-phrase heads:

(a) *The innocent* are often deceived by *the unscrupulous*. (7.24)

(b) *The industrious Dutch* are admired by their neighbours. (7.25)

(c) She admires *the mystical*. (7.26)

### Type (a): *the innocent*

7.24    Adjectives which can premodify personal nouns (*the young people*) can be noun-phrase heads (*the young*) with plural and generic reference denoting classes, categories, or types of people. The adjective can itself be premodified [3–5] or postmodified [6–7]:

- 123 -

Complementation of verbs and adjectives

**Introduction**

**16.1** In 2.32 we defined COMPLEMENTATION as 'part of a phrase or clause which follows a word, and completes the specification of a meaning relationship which that word implies'. In this chapter, we examine the ways in which lexical verbs and adjectives determine, in this way, the grammatical patterns that follow them. We began this task in 2.19, where verbs were classified into various types (transitive, intransitive, copular, etc) according to their complementation. Now we must go further, and examine patterns of greater variety. But before doing so, we must analyse the phenomenon of multi-word verbs, a topic of peculiar importance in English. This study will occupy the first seventeen sections of the chapter, as a necessary prelude to the study of verb complementation.

# Multi-word verbs

## Verb–particle combinations

**16.2** The main category of multi-word verbs consists of such combinations as *drink up*, *dispose of*, and *get away with*, which we will study under the headings of PHRASAL VERB, PREPOSITIONAL VERB, and PHRASAL-PREPOSITIONAL VERB respectively. However, these combinations are considered multi-word verbs only where they behave as a single unit.

Since the verb has been considered a class of word (*cf* 2.35), it may seem a contradiction to speak of 'multi-word verbs'. The term 'word' is frequently used, however, not only for a morphologically defined word class, but also for an item which acts as a single word lexically or syntactically (*cf* 9.10*ff* on complex prepositions). It is this extended sense of 'verb' as a 'unit which behaves to some extent either lexically or syntactically as a single verb' that we use in labels such as 'prepositional verb'. Thus in the sentence:

> We *disposed of* the problem.

the word *disposed* remains morphologically a verb, being the item which has variable inflection (*dispose/disposes/disposed*, etc); but the sequence *disposed of* also functions in various ways as a single unit, such that for some purposes the sentence can be reasonably divided into:

> [We] [disposed of] [the problem].

rather than into:

> [We] [disposed] [of the problem].

The words which follow the lexical verb in expressions like *drink up*, *dispose of*, and *get away with* are morphologically invariable, and will be given the neutral designation PARTICLES. They actually belong to two distinct but overlapping categories, that of prepositions and that of spatial adverbs (though such adverbs are not necessarily used with spatial meaning). The term 'particle' will therefore apply to such words as these (see the fuller lists in 9.7 and 9.66), when they follow and are closely associated with verbs.

- 124 -

PARTICLES

(A) *against*, *among*, *as*, *at*, *beside*, *for*, *from*, *into*, *like*, *of*, *onto*, *upon*, *with*, etc.

(B) *about*, *above*, *across*, *after*, *along*, *around*, *by*, *down*, *in*, *off*, *on*, *out* ⟨AmE⟩, *over*, *past*, *round*, *through*, *under*, *up*, etc.

(C) *aback*, *ahead*, *apart*, *aside*, *astray*, *away*, *back*, *forward(s)*, *home*, *in front*, *on top*, *out* ⟨BrE⟩, *together*, etc.

(On *out* as a preposition, *cf* 9.18 Note.)

Those grouped in list (A) are prepositions only; those in (C) are spatial adverbs only (unless they form part of a complex preposition, as in *out of*); and those in (B) can be either prepositions or spatial adverbs, and in the latter function are known as 'prepositional adverbs' (*cf* 9.65*f*). List (C) includes adverbs like *away* and *on top*, which correspond to complex prepositions such as *away from* and *on top of* and so are also known as prepositional adverbs (*cf* 9.66). Thus we include particles which form the first element of a complex preposition:

Come *along* (*with* us/me).    They moved *out* (*of* the house).

The most obvious difference between the prepositions and the spatial adverbs is that where prepositions require a following noun phrase as a prepositional complement, there is no such requirement for adverbs (*cf*, however, the phenomenon of deferred prepositions, 9.6). Hence Classes (A), (B), and (C) can be distinguished as follows:

| | PREPOSITIONAL CONSTRUCTION | ADVERBIAL CONSTRUCTION |
|---|---|---|
| (A) | The dog went *for me*. | *The dog went *for*. |
| (B) | Jack fell *down the hill*. | Jack fell *down*. |
| (C) | *We must not look *back the past*. | We must not look *back*. |

Particles of Class (B) are the only ones which are acceptable in both constructions.

Not all multi-word verbs consist of lexical verbs followed by particles. We shall illustrate other types, such as those of *take pride in*, *cut short*, *see fit*, or *put paid to*, in 16.7–8 and 16.17.

Note  [a] Although the inflection of a multi-word verb is regularly attached to the lexical verb, the occurrence of 'slips of the tongue' such as the following (noted during a radio interview) deserves attention:

*The editor must do precisely as he *see fits*.

This anomalous shift of the inflection from the verb to the adjective testifies to a tendency for speakers to perceive the multi-word verb as a single grammatical unit.

[b] On the exceptional use of some Class (A) words as adverbs (*eg*: *to*), *cf* 9.66 Notes [a] and [b].

[c] The lexical verbs occurring in multi-word verbs are frequently the most common lexical verbs, and are typically associated with physical movement or state: *eg*: *come*, *fall*, *get*, *give*, *go*, *keep*, *make*, *put*, and *take*. At the other extreme, however, are words which occur as verbs only when combined with particles, *eg*: *beaver* in *beaver away*, *egg* in *egg on*, and *eke* in *eke out*:

She *egged* him *on*.    *She *egged* (him).

Note also that some normally intransitive verbs can become transitive when combined with a particle, and that conversely some normally transitive verbs can become intransitive when combined with a particle:

They are *living* it *down*.    *They are *living* it.
The plane *took off*.    *The plane *took*.

- 125 -

second noun phrase in a sentence like [1] as the complement of the preposition *at* and not as the direct object of a verb *look at*:

> Many people looked at *the pictures*.                                    [1]

This is despite the fact that the passive is frequently possible (with some stylistic awkwardness) as in [1a]:

> The picture was *looked at* by many people.                            [1a]

The intransitive interpretation, on the other hand, is justified (for example) by the potentiality of adverbial insertion:

> Many people looked *disdainfully* at the picture.

where insertion between V and $O_d$ is usually avoided:

> *?Many people examined disdainfully the picture.

The noun phrase following the preposition in such constructions is termed a PREPOSITIONAL OBJECT.

There are therefore two complementary analyses of a sentence like *She looked after* ['tended'] *her son*:

ANALYSIS 1:    S        V                A

               *She    looked    after    her son*

ANALYSIS 2:    S                 V              O

The former analysis is the one we follow if we call this kind of construction intransitive. Analysis 2, on the other hand, highlights the resemblance between *She looked after her son* and *She tended her son*. By naming this category of prepositional verbs 'Type I', we avoid the unclarity which results from the use of 'intransitive' or 'transitive' in this connection. The above analyses are discussed further in 16.13–15.

Note    Whereas a sequence of verb and preposition like *live at* is a purely nonidiomatic free combination, in prepositional verbs like *look at*, *look for*, etc the verb word has a literal use, but has a fixed association with the preposition. These cases may, in their turn, be distinguished from other prepositional verbs, *eg*: *go into* ['investigate'] where both words form a semantically idiomatic (often metaphorical) unit (*cf* 16.12 for a further exploration of these categories and their relation to a scale of idiomaticity).

**Prepositional verbs contrasted with phrasal verbs**

16.6    We must now briefly attend to another distinction between similar-looking constructions. The following exemplify Type I prepositional verbs which contain particles of Class (B) in 16.2, and are therefore capable of confusion with Type II phrasal verbs (*cf* 16.4):

| | |
|---|---|
| She *called on* her friends. | You should *invest in* property. |
| We *saw through* his imposture. | She *came by* a fortune. |
| I've *come across* a problem. | The car *ran over* a bump. |

These are distinguished from almost all Type II phrasal verbs by the inability of the particle to be moved to a position after the following noun phrase:

(1) She *called on* her friends.    ~ *She *called* her friends *on*.

[*cf*: (2) She *switched on* the light.    ~  She *switched* the light *on*.]

  (1a) She *came by* a fortune.    ~ *She *came* a fortune *by*. ['acquired']

[*cf*: (2a) She *put by* a fortune.    ~  She *put* a fortune *by*. ['kept']]

Similarly, the order of particle and pronoun is different:

  (1b) She *called on* them.    NOT    *She *called* them *on*.
  (2b) She *switched* it *on*.    NOT    *She *switched on* it.

Another criterion is stress. Both constructions generally permit the corresponding passive, but in the Type II phrasal verb (2), a higher degree of stress (including nuclear stress when the particle is in final position) usually falls on the adverb particle. In the prepositional verb (1), on the other hand, the stress normally occurs on the lexical verb preceding the particle:

  (1c) He '*called on* the dean.    ~ The dean was CÀLLED on.
  (2c) She *switched* '*on* the light.    ~ The light was *switched ÒN*.

The same contrast of stress is observed in other constructions with a postponed particle, *eg* relative clauses:

  (1d) the fortune (that) he CÀME by.
  (2d) the fortune (that) he *put BỲ*.

Compare also:

  (1e) This is a dangerous road to GÈT over. (*also* . . . to get òver)
  (2e) It's a loss she will never get òver.

However, the 'stress test' is not entirely reliable, as polysyllabic prepositions like *across*, *over*, and *without* usually receive stress, and other factors such as contrastive focus may affect the positioning of the nucleus:

I could have done withòUT that PRÉSENT.

  ~ That's a present I could have done withòUT.

She will never get òver it.

  ~ It is a loss that she will never get òver.

We shall return to these distinctions in 16.16.

Note    [a] It is not unusual for the same sequence of verb + particle to function either as a phrasal verb or as a prepositional verb:

He '*turned* '*on* his supPÒRTers. [phrasal verb: 'He excited them']    [1]

He '*turned on* his supPÒRTers. [prepositional verb: 'He attacked them']    [2]

A reduced version of [1] would be *He 'turned them 'on*, while the correspondingly reduced version of [2] would be *He 'turned on them*.

[b] A special case of the above homonymy occurs where the phrasal and prepositional verbs are not only identical in form, but similar in meaning. Examples are *run through, run over*, and *look over*. Thus:

The car *ran* him *over*.    The car *ran over* him.

These have virtually the same meaning, but the former (the phrasal verb) is reserved for the description of driving accidents, in which the object refers to a casualty.

The car *ran* '*over* a BÙMP.

therefore has no corresponding phrasal verb construction:

*The car *ran* a 'bump Òver.

in technical writing (especially in the social sciences) to admit *-ing* participles rather more freely in premodification: *the developing countries, the (partially) hearing child, a continuing commitment, an ongoing concern, a voting member*.

### Premodification by *-ed* participles

17.100   Much of what has been said of *-ing* participles (*cf* 17.98*f*) applies to *-ed* participles also, but there are additional issues. In the first place, the *-ed* participle can be active or passive but, as with postmodification (*cf* 17.29), the active is rarely used in premodification. Contrast:

>   the immigrant who has *arrived*
>   BUT NOT: *the *arrived* immigrant

The following are exceptional:

>   the *vanished* treasure ['the treasure which has vanished']
>   a *retired* teacher
>   *reduced/fallen/increased* prices; *risen* costs ⟨in the technical language of economics⟩

Premodification is somewhat more common when an active participle is modified by an adverb:

>   the *newly-arrived* immigrant ['the immigrant who has arrived recently']
>   our *recently-departed* friend ['our friend who has departed recently']
>   a *well-read* woman ['a woman who has read a lot']
>   a *soft-spoken* person ['a person who speaks softly']
>   ?a *recently-arisen* problem ['a problem which has arisen recently']

Within the passive, we must distinguish the passive which refers to process from the passive which refers to state (*cf* 'statal passive', 3.77). A statal example:

>   some *complicated* machinery
>   ~ The machinery is *complicated*.
>   ~ The machinery was *complicated* by the designer.

With the statal type belong also *born* and some uses of *hidden, married, troubled, darkened*, etc, but in premodification they must either have 'permanent' reference or be modified by an adverb:

>   a *born* musician ['a natural musician'], a *newly-born* child
>   a *married* man, *married* life

*The carefully hidden spy* illustrates the general contrast between *-ing* and *-ed* participles. They are similar in postmodification:

>   The spy, carefully *hidden* in the bushes,
>   The spy, carefully *hiding* in the bushes,  } kept watch on the house.

But the *-ing* participle, unlike the *-ed* participle, resists premodification: *\*the carefully-hiding spy*.

Note    With the acceptability of *a recently-arrived plane* beside *\*an arrived plane*, compare *a brown-eyed girl* beside *\*an eyed girl* (*cf* 17.102).

- 128 -

**17.101**   Most *-ed* participles have passive meaning, and only a few will easily admit the permanent reference that will permit premodifying use. We may contrast the participle of the stative verb in [1] with that of the dynamic verb in [2]:

> *The wanted man* was last seen in Cambridge.
>> [the man goes on being wanted by the police]                                   [1]
> \**The found purse* was returned to its owner.
>> [the purse was found at a particular moment]                                   [2]

But *a lost purse* is acceptable, because, although a purse is no longer regarded as 'found' after it has been retrieved, a purse will be regarded as 'lost' throughout the period of its disappearance. This aspectual relation corresponds to that of the perfective of conclusive verbs (*cf* 4.33), as can be seen in the possible paraphrase: *a lost purse* ['a purse that has been lost']. Other examples:

> the *defeated* army, a *damaged* car, a *broken* vase

Contrast:

> a *wanted* man ['a man who is wanted by the police']

But not, except in special contexts, such as second instances (*cf* 17.109), which we must ignore here:

| | |
|---|---|
| \*a *sold* car | \*a *built* house |
| \*the *mentioned* article | \*a *described* man |

Exceptions to the general rule suggest that the semantic and aspectual factors are more complicated than we have indicated. For example, although a sum of money can go on being needed, one does not normally say ?*the needed money*; although a car is stolen at a moment of time, one can speak of *the stolen car* ['the car that has been stolen'].

The premodifying participle usually characterizes a type rather than an instance: *a muttered reply* is a type of reply, and *a drawn sword* describes a typical posture. With *an organized tour* we may perhaps explain the premodification through the continuing and professional nature of the organization (*ie* 'a package tour', as distinct from a tour privately organized on a specific occasion); or perhaps we should supply an omitted adverb 'an (officially *or* specially) organized tour', since we must remember that all of the starred participial phrases become acceptable when modified by adverbs (on the tendency, esp in BrE, to hyphenate such premodifiers, *cf* App III.4*f*):

| | |
|---|---|
| a *recently* sold car | a *well-built* house |
| the *above-mentioned* article | a *carefully described* man |

**17.102**   Modifiers in *-ed* may be directly denominal and not participles at all (*cf* App I.38):

> a *bearded* man ['a man with a beard', 'a man who has a beard']
> the *vaulted* roof ['a roof with vaults']
> a *wooded* hillside ['a hillside covered with woods']

- 129 -

But constraints occur: while we have *a powerful engine*, and *a leggy spider*, we do not have

| | |
|---|---|
| *a *powered* engine | BUT: a *diesel-powered* engine |
| *a *legged* spider | BUT: a *long-legged* spider |

These constraints on unmodified *-ed* forms can be explained by the simple but communicatively relevant principle that what one says should carry useful, nontrivial information. Thus all engines will produce power and all spiders have legs. However, *-ed* denominals which provide new information, *an engine powered by diesel*, *a spider with long legs*, etc, become fully acceptable.

By the same principle, both the unmodified *a bearded man* and the modified *a white-bearded man* are acceptable, since not all men have beards and even fewer have white ones. A common feature of acceptable *-ed* adjectives is that they express the notion of 'inalienable possession', *ie* they are normally thought to be permanent attributes (*cf*: *I've lost my car*, but not normally: **I've lost my beard*). Those which express alienable possession, *eg*: **a carred man* ['a man with a car'], **a two-carred man* ['a man with two cars'], are not acceptable and productive formations.

It finally remains to explain the acceptability of adjectives not ending in *-ed*, but in *eg*: *-ful*, *-y*, *-ous*, *-ic*, *-ish*. Such formations express an unusual degree, amount, etc:

a *powerful* engine ['an engine with unusual power']
a *hairy* caterpillar ['a caterpillar with an unusual amount of hair']
a *leggy* spider ['a spider with unusually long legs']
a *pimply* face ['a face with an unusually large number of pimples']

Thus this type obeys the same principle that we invoked for *a bearded man* as well as *a diesel-powered engine*: to carry useful, nontrivial information.

Intransitive verbs rarely yield premodifying *-ed* participles (*cf*: **an arrived plane*, 17.100 Note).

**17.103** If the *-ed* participle has a *by*-agent or other prepositional construction, only postmodification is possible (*cf* adjective complementation, 16.69). Thus we have 'the *defeated* army', but:

the army *defeated by the enemy* [NOT: *the by the enemy defeated army]
the army *defeated for lack of ammunition* [NOT: *the for lack of
    ammunition defeated army]

However, some unmodified *-ed* participles in fixed expressions have postposition (*cf* 7.21):

| | |
|---|---|
| the amount *demanded/asked* | the earliest inventions *known* |
| for services *rendered* | money well *spent* |

Prepositional verbs normally follow the head:

the sum *agreed upon*
the pages *referred to*
an event *unheard of* [but also: 'an *unheard-of* event']

Some *-ed* participles have pre- or postmodifying position with different meanings, *eg*:

| | |
|---|---|
| the people *concerned* | a *concerned* expression |
| ['the people in question'] | ['worried, anxious'] |
| the students *involved* | an *involved* question |
| ['the students in question'] | ['complicated'] |
| jobs *wanted* | *wanted* persons |
| ['jobs wanted by individuals'] | ['persons wanted by the police'] |

### Premodification by nouns

**17.104**  Noun premodifiers are often so closely associated with the head as to be regarded as compounded with it, as indicated by the stress on the premodifying noun instead of the head:

> his *'life* story      a *'dish* cloth      a *'Sussex* man

On the other hand, we say:

> an *,iron* 'rod      *,life* im'prisonment      a *,Sussex* 'village

The conditions under which the different stress patterns are adopted are by no means wholly clear, but are connected with the degree to which a sequence is 'institutionalized' as a lexical item, *ie* a compound (*cf* App I.57*ff*).

In most cases, premodifying nouns correspond to postmodification with prepositional phrases:

| | |
|---|---|
| his *life* story | ~ the story *of his life* |
| a *dish* cloth [NB singular] | ~ a cloth *for dishes* |
| a *Sussex* man | ~ a man *from Sussex* |
| an *iron* rod | ~ a rod *of iron* |
| *life* imprisonment | ~ imprisonment *for life* |
| a *Sussex* village | ~ a village *in Sussex* |
| a *gift* tax [NB singular] | ~ a tax *on gifts* |

In accordance with the general tendency noted earlier (*cf* 17.8), the premodifying structure has reduced explicitness in relation to the postmodifying structure, and if the relationships between the nouns become unclear or unpredictable, premodification is unacceptable. This becomes apparent if examples [1–10] in 17.37 with the range of prepositions involved in prepositional phrase postmodification are tested for noun premodification:

| | | | | |
|---|---|---|---|---|
| the road *to Lincoln* | [1] | ~ | the *Lincoln* road | [1a] |
| this book *on grammar* | [2] | ~ | this *grammar* book | [2a] |
| a man *from the electricity* | | ~ | ?an *electricity company* | |
| *company* | [3] | | *man* | [3a] |
| passengers *on board the* | | ~ | ?*ship* passengers | [4a] |
| *ship* | [4] | | | |
| action *in case of fire* | [5] | ~ | ?*fire* action | [5a] |
| the meaning of this | | ~ | ?this *sentence* meaning | [6a] |
| *sentence* | [6] | | | |

| | | | |
|---|---|---|---|
| the house *beyond the church* | [7] | ~ the *church* house | [7a] |
| two years *before the war* | [8] | ~ two *war* years | [8a] |
| a delay *pending further inquiry* | [9] | ~ a *further inquiry* delay | [9a] |
| a tree *by a stream* | [10] | ~ *a *stream* tree | [10a] |

In this set, only [1a] and [2a] are fully possible premodification alternatives to postmodification by prepositional phrase; [3a], [4a], [5a], and [6a] have an unusual ring about them as equivalents of [3], [4], [5], and [6] respectively; [7a], [8a], and [9a] do not carry the respective meanings of [7], [8], and [9]; [10a] is unacceptable.

As observed in connection with premodifying nouns in the plural (*cf* 17.109), a phrase like [3a] is somewhat more likely to be used in second instances, *ie* after the explicit relationship has been fully clarified:

A: Today *a man from the electricity company* called.
B: Oh, so what did *the electricity company man* say?

Also, [3a] might conceivably be used in technical jargon where explicit relations need not be indicated or in headline language where the explanation follows.

Note    An example similar to [7a] whose interpretation was indeed tried legally is the following:
Dock work is arduous.
It should be interpreted as 'work in or on the docks', not as 'work near the docks'. A British Court of Appeal upheld the above linguistic statement, and *The Times* law report had the following headline in consequence:
Work near docks is not dock work.

**17.105**    One noteworthy constraint against using nouns from postmodifying phrases as premodifiers is the relative impermanence of the modification in question. Thus [1] will readily yield [1a]:

*The table in the corner* was laid for dinner.    [1]
*The corner table* . . .    [1a]

But we cannot do the same with [2]:

*The man in the corner* spoke to me.    [2]
**The corner man* . . .    [2a]

However, this is not a property of the lexical item (in this instance, *corner*) but of the semantic relation. Premodification confers relative permanence, and because a table is not free to move of itself, we can premodify *table* but not *man* by *corner*.

Conversely, not all noun premodifiers have prepositional phrase analogues, *eg*:

*consumer* goods    ~ goods *of the consumer*
a *welfare* state    ~ a state *of welfare*

There is also an analogous relation between some types of premodification and coordination:

The plane is *both a fighter and a bomber*.
~ *a fighter-'bomber*

# English Composition and Grammar

## BENCHMARK EDITION

**John E. Warriner**

## Third Course



**Harcourt Brace Jovanovich, Publishers**

Orlando          San Diego          Chicago          Dallas

10. Here, then, are some of the reasons for the popularity of ballads since the Middle Ages.

## DIAGRAMING SENTENCES

Many students can understand a sentence better when they use a diagram. A diagram is a picture of how the parts of a sentence fit together and how the words in a sentence are related.

### Diagraming the Subject and the Verb

A diagram begins with a straight horizontal line. This line is for the main parts of the sentence. Crossing it approximately in the center is a short vertical line that divides the complete subject from the complete predicate. The simple subject is placed to the left of the vertical line, the verb to the right of it.

PATTERN



EXAMPLE    Fish swim.

EXAMPLE    Wait!

If the sentence has an understood subject, place *you* in parentheses on the subject line.



Nouns of direct address are placed on a separate horizontal line above the understood subject.

- 134 -

EXAMPLE    Sit, **Fido.**



The expletive *there* is also placed on a separate horizontal line. (Modifiers have been omitted from the following diagram.)

EXAMPLE    **There** is a fly in my soup.



When the sentence has a compound subject, diagram it as in the following example. Notice the position of the coordinating conjunction on the broken line.

EXAMPLE    **Howard** and **Basil** were fishing.



If the verb is compound, it is diagramed in this way:

EXAMPLE    They **went** and **ate.**



Diagraming Sentences > 335

A sentence with both a compound subject and a compound verb is diagramed in this way:

**EXAMPLE**    **Coaches** and **players jumped** and **cheered.**



Notice how a compound verb is diagramed when the helping verb is not repeated.

**EXAMPLE**    They are **sitting** and **reading.**



Since *are* is the helper for both *sitting* and *reading*, it is placed on the horizontal line, and the conjunction *and* joins the main verbs *sitting* and *reading*.

Sometimes parts of a compound subject or a compound verb will be joined by correlative conjunctions. Correlatives are diagramed like this:

**EXAMPLE**    **Both** Bob **and** Teri can **not only** draw **but also** paint.



GRAMMAR

GRAMMAR

**EXERCISE 13.  Diagraming Subjects and Verbs.**  Diagram the following sentences:

1. Hyenas laugh.
2. Listen, Miguel!
3. Chad and he were hiking.

4. Farmers plant and harvest.
5. Both Sally and Beth were nominated and elected.

## Diagraming Adjectives and Adverbs

Adjectives modify nouns or pronouns, and adverbs modify verbs, adjectives, or other adverbs. Both adjectives and adverbs are written on slanted lines connected to the words they modify.

PATTERN



EXAMPLE    **That old** clock has **never** worked.



An adverb that modifies an adjective or an adverb is placed on a line connected to the adjective or adverb modified.

EXAMPLE    This **specially** designed glass **very** seldom breaks.



- 137 -

GRAMMAR

Notice the position of the modifiers in the following example:

EXAMPLE    **Soon** Anne and **her** sister will graduate and will move.



*Her* modifies only one part of the compound subject: *sister*.
*Soon* modifies both parts of the compound verb: *will graduate*
and *will move*. Where would *will* have been placed in the dia-
gram if it had not been repeated before *move*?

When a conjunction joins two modifiers, it is diagramed as
in this example:

EXAMPLE    The English **and** Australian athletes worked long **and**
very hard.



**EXERCISE 14. Completing Sentence Diagrams.**    Diagrams
for the following sentences have been provided for you. Copy
them on your paper, and fill them in correctly.

## CERTIFICATE OF SERVICE

I hereby certify that on this day, September 9, 2022, a copy of the foregoing Brief is being submitted to the Clerk's Office via electronic means and that it is anticipated that the Court's ECF system will serve a copy upon the following:

      Herbert C. Donovan Esq.
      Jason D. Killips Esq.
      Andrew B. Fromm Esq.
      Brooks Wilkins Sharkey & Turco PLLC
      401 South Old Woodward, Suite 400
      Birmingham, MI 48009
      donovan@bwst-law.com
      killips@bwst-law.com
      fromm@bwst-law.com

                              s/ Paul J. Krog
                            Counsel for Appellant